E-FILED
Tuesday, 15 April, 2008  12:34:04 PM
Clerk, U.S. District Court, ILCD

05415-R4178
TMP/ej

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

MICHAEL STEVENSON, N93569,          )
                                    )
                    Plaintiff,      )
                                    )
v.                                  )          No. 07-3108-HAB-CHE
                                    )
SCHOLZ, R. ZIMMERMAN, RODGER E.     )
WALKER, JR., MELODY FORD, D.        )
FUQUA, TARA GOINS, and VAN STRIEN.  )
                                    )
                    Defendants.     )

## MOTION FOR SUMMARY JUDGMENT

NOW COMES the Defendant, ROBERT SCHOLZ, D.D.S., by his attorney, THERESA M. POWELL of HEYL, ROYSTER, VOELKER & ALLEN, and for his Motion for Summary Judgment pursuant to Federal Rule 56, states:

### I.  INTRODUCTION

The Plaintiff in this case has filed a cause of action against Dr. Scholz, one of the dentists who provides care and treatment to inmates at the Western Illinois Correctional Center.  Pursuant to this Court's Case Management Order No. 1 dated May 3, 2007, the Court found that Plaintiff's Complaint stated a cause of action for deliberate indifference to a serious dental need.  Defendant admits that Plaintiff suffered from gingivitis; however, Defendant denies that Plaintiff's condition constituted a serious medical need.  Nevertheless, Defendant denies that any act or omission on his part constituted deliberate indifference to a serious medical need of the Plaintiff.  Defendant now brings this Motion for Summary Judgment as there are no genuine issues of material fact regarding the care and treatment provided to Michael Stevenson.

**HEYL ROYSTER**
**VOELKER**
**& ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

## II. <u>MATERIAL FACTS CLAIMED TO BE UNDISPUTED</u>

1.    According to Plaintiff's medical records, it appears that he was screened and oriented to the Western Illinois Correctional Center in May of 2006.  (Exhibits 1 and 1-A.)

2.    In general, Dr. Scholz would not be advised of Plaintiff's medical complaints which were not dental related.  These complaints would be directed to the nursing staff and potentially to the Medical Director.  (Exhibit 1.)

3.    Unless the nurse or physician referred the patient to the dental office following a complaint, Dr. Scholz would not be made aware of complaints concerning an inmate's mouth. (Exhibit 1.)

4.    The first reference in the medical records to any problems regarding the patient's mouth appears on December 11, 2006.  According to Dr. Brown's note, the patient reported that his gums were bleeding despite flossing.  Dr. Brown's note indicates that he would discuss this with dental.  (Exhibits 1 and 1-B.)

5.    There do not appear to be any additional medical complaints concerning the patient's mouth or teeth in the Plaintiff's medical file.  (Exhibit 1.)

6.    In the course of Dr. Scholz' practice as a dentist at the Western Illinois Correctional Center, he did see an inmate by the name of Michael Stevenson.  His dental records attached hereto include Exhibits 1-C and 1-D.

7.    Exhibit 1-C identifies that Mr. Stevenson did have moderate periodontal disease when Dr. Scholz saw him in July of 2006.  (Exhibit 1.)

8.    Notes of Dr. Scholz' care and treatment from July 5, 2006 through September 12, 2007 are shown on Exhibit 1-D.

**HEYLROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

2

05415-R4178
TMP/ej

9.     On July 5, 2006 at 8 a.m., Mr. Stevenson came to see Dr. Scholz for complaints of bleeding gums.  Dr. Scholz diagnosed him with moderate gingivitis and he was provided with oral hygiene instructions.  (Exhibits 1 and 1-D.)

10.    On August 6, 2006, Plaintiff returned complaining of problems with his gums from food getting packed between his teeth.  Plaintiff was wanting a cleaning.  Oral health instructions were given to him.  (Exhibits 1 and 1-D.)

11.    At that time, Dr. Scholz explained to Mr. Stevenson that dentists did not provide cleanings and there was no dental hygienist at Western Illinois Correctional Center to perform that function.  (Exhibit 1.)

12.    In Dr. Scholz' practice as one of the dentists at the Western Illinois Correctional Center, he took care of inmates' teeth in the order of worst to best.  Mr. Stevenson did not have a significantly serious condition to warrant immediate treatment for his complaints.  There were many other inmates who had immediate and emergent problems that needed to be addressed first.  (Exhibit 1.)

13.    The Department of Corrections has Administrative Directives which categorize dental problems from Category I to Category VI.  (Exhibit 1.)

14.    Mr. Stevenson's moderate gingivitis was not a Category I condition.  (Exhibit 1.)

15.    Dr. Scholz would have considered Mr. Stevenson's gingivitis to be a Category III or Category II condition.  (Exhibit 1.)

16.    At the time Dr. Scholz first saw Mr. Stevenson, he explained to him the need and requirement to provide care and treatment to those patients who suffered Category I conditions first. (Exhibit 1.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

17.    Dr. Scholz advised Mr. Stevenson that he needed to practice good oral hygiene and by doing so, his teeth would be cleaner in order to halt and prevent worsening of his condition. (Exhibit 1.)

18.    On October 3, 2006, Mr. Stevenson came back to the dental unit again asking for a cleaning. Dr. Scholz advised him that him his teeth were not bad enough to warrant bumping off or fillings. Dr. Scholz suggested that he ask for a transfer. (Exhibits 1 and 1-D.)

19.    On October 3, 2006, Dr. Scholz explained to Mr. Stevenson that the Western Illinois Correctional Center did not have a dental hygienist but that other facilities may have one. He may possibly be able to get his teeth cleaned there in an effort to treat or prevent worsening of his gingivitis. (Exhibit 1.)

20.    On October 24, 2006, Mr. Stevenson appeared in the dental unit but was not seen by Dr. Scholz. (Exhibit 1.)

21.    On December 19, 2006, Dr. Scholz responded to a grievance regarding Mr. Stevenson's complaints that Dr. Scholz was not treating his dental health appropriately. Dr. Scholz advised him that his gingivitis was not emergent. (Exhibits 1 and 1-D.)

22.    Mr. Stevenson complained of terrible pain, headaches, and severe bleeding. Dr. Scholz noted that on examination, there was no objective evidence to verify the complaints made by the Plaintiff in his grievance. Dr. Scholz found no dental reason to be causing Plaintiff's complained of pain or headaches. He saw no severe bleeding. (Exhibit 1.)

23.    Again, Dr. Scholz explained and provided Mr. Stevenson with oral health information. (Exhibit 1.)

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

24.    The next time Dr. Scholz saw Mr. Stevenson was on July 31, 2007.  At that time, Dr. Scholz examined Mr. Stevenson's gums and determined that he would perform a deep scaling and root planing in an effort to address his gingivitis.  (Exhibit 1.)

25.    These procedures were performed on August 8, 2007.  (Exhibits 1 and 1-D.)

26.    Dr. Scholz examined Mr. Stevenson's gums again on September 12, 2007.  At that time, his gums looked much better than they had before.  (Exhibits 1 and 1-D.)

27.    At that time, Dr. Scholz determined that Mr. Stevenson's complaints regarding his gums were resolved.  His periodontal disease in the form of gingivitis was under control and that with proper oral hygiene, Mr. Stevenson should not have significant problems.  (Exhibit 1.)

28.    So long as Mr. Stevenson maintains proper oral hygiene, he should not have any medical problems relating to gingivitis.  (Exhibit 1.)

29.    At no time did Dr. Scholz consider Mr. Stevenson's gingivitis to be a serious medical need in need of immediate medical treatment.  (Exhibit 1.)

30.    Dr. Scholz considered Mr. Stevenson's gingivitis to be moderate.  This level of gingivitis did not, in and of itself, create a risk of substantial harm to Mr. Stevenson.  (Exhibit 1.)

31.    In Dr. Scholz' opinion, Mr. Stevenson's complaints of pain and headaches were not related to his periodontal disease at any time.  These are medical conditions which should have been, and could have been treated by a physician and not by a dentist.  (Exhibit 1.)

32.    With respect to Mr. Stevenson's complaints of bleeding, this is a common condition associated with poor oral hygiene.  Bleeding is not painful and often occurs in gums where an individual has not maintained proper oral hygiene.  (Exhibit 1.)

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

33.    Bleeding gums and periodontal disease do not prevent someone from being able to eat.  (Exhibit 1.)

34.    At no time did Mr. Stevenson ever suggest to Dr. Scholz that he was having any difficulty eating.  (Exhibit 1.)

35.    Dr. Scholz prescribed Tetracycline, an antibiotic, on August 8, 2007 in conjunction with the root cleaning procedure he performed.  (Exhibits 1 and 1-E.)

36.    Dr. Scholz again prescribed Tetracycline, an antibiotic, on September 12, 2007.  (Exhibits 1 and 1-F.)

37.    The next time Dr. Scholz saw Mr. Stevenson was October 10, 2007.  At that time, Dr. Scholz noted that Mr. Stevenson's gums continued to look good. (Exhibits 1 and 1-G.)

38.    Dr. Scholz saw Mr. Stevenson again on October 24, 2007.  Dr. Scholz provided him with 30 more tablets of an antibiotic to address any threat of infection from the presence of any possible bacteria that may have been present in Mr. Stevenson's mouth at or near the site of the area where Dr. Scholz conducted the deep scaling procedure on August 8, 2008.  (Exhibits 1 and 1-G.)

38.    In Dr. Scholz' opinion, Mr. Stevenson's gingivitis was progressing appropriately and satisfactorily.  (Exhibit 1.)

39.    His condition did not pose a risk of substantial harm to his health at any time.  (Exhibit 1.)

40.    Shortly thereafter, it appears that Mr. Stevenson was transferred to the Illinois River Correctional Center.  Dr. Scholz does not provide dental services at that facility.  Dr. Scholz no longer is in contact with Mr. Stevenson and has no knowledge regarding the current status of his gingivitis and/or his gums or teeth.  (Exhibit 1.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

6

05415-R4178
TMP/ej

41.    As of the time that Mr. Stevenson left Dr. Scholz' care, his gums were in satisfactory condition.  (Exhibit 1.)

42.    Gingivitis in Mr. Stevenson's form was not an emergent medical need, nor was it the type of condition that was at imminent risk of causing him substantial harm.  (Exhibit 1.)

43.    Dr. Scholz is aware of no medical conditions caused by Mr. Stevenson's gingivitis. (Exhibit 1.)

44.    Gingivitis is a periodontal disease.  This condition is common in the general population and is even more common to inmates.  (Exhibit 1.)

45.    Inmates, in general, tend to have poor dental hygiene which contributes to the development of gingivitis.  (Exhibit 1.)

46.    Gingivitis is caused by and is aggravated by a buildup of plaque and/or tartar on the gums and teeth which, if it is not removed, may cause the condition to progress.  (Exhibit 1.)

47.    There are various forms of gingivitis from mild to severe.  (Exhibit 1.)

48.    Mr. Stevenson suffered from moderate gingivitis.  (Exhibit 1.)

49.    Gingivitis in its most severe form can contribute to the development of serious medical issues.  (Exhibit 1.)

50.    However, Mr. Stevenson's gingivitis had not risen to a level which could pose a risk of harm to Mr. Stevenson's overall health status.  (Exhibit 1.)

51.    The root planing and scaling performed in August of 2007 addressed the gingivitis and prevented Plaintiff from developing any medical complications from his then-present form of gingivitis.  (Exhibit 1.)

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

52.    The complaints of bleeding and swollen gums made by Mr. Stevenson were alleviated with this procedure.  (Exhibit 1.)

53.    Not all individuals who suffer from gingivitis require a root planing and scaling procedure.  (Exhibit 1.)

54.    Most individuals can be treated with dental cleanings, when available.  (Exhibit 1.)

55.    Dr. Scholz does not consider gingivitis to be a condition which requires a consultation with an outside specialist.  (Exhibit 1.)

56.    Bleeding is a common symptom from gingivitis.  (Exhibit 1.)

57.    The common form of treatment for gingivitis is proper dental hygiene.  In most cases, proper dental hygiene and cleanings can halt the progression of gingivitis.  (Exhibit 1.)

58.    The antibiotics given to Mr. Stevenson were provided in association with the root planing and scaling and this procedure may allow bacteria to travel deep into the gums where the procedure took place.  The antibiotics are given to prevent an infection from developing during that time frame.  (Exhibit 1.)

59.    Antibiotics are not required as a standard of care to address bleeding gums.  (Exhibit 1.)

60.    Overuse of antibiotics may actually create greater risks of harm for patients who have no medical need for those specific medications.  (Exhibit 1.)

61.    In the course of this case, Dr. Scholz has reviewed medical records in search of evidence regarding Mr. Stevenson's overall health from July 2006 through August of 2007.  (Exhibit 1.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

8

05415-R4178
TMP/ej

62.    It should be noted that before July 5, 2006 (the date of Dr. Scholz' visit with Mr. Stevenson), the last time Plaintiff was weighed was June 19, 2006. (Exhibits 1 and 1-J.) At that time, Mr. Stevenson was seen by Dr. Brown for complaints of his left foot, the orthopedic problems. Plaintiff had been complaining of ankle pain, which was now less swollen as he walked. Dr. Brown's note states, "Lose 100 pounds" for the plan. (Exhibits 1 and 1-J.) The next time Plaintiff was weighed was July 21, 2006. (Exhibits 1 and 1-H.) At this time, he weighed 255 pounds. He had already lost eight pounds. There is nothing in the records to indicate that this was a result of his dental issues. In fact, Dr. Brown's record from July 21, 2006 states, "Is losing weight purposely. The orthopedic issue is resolving favorably, but he has pesky nasal allergies affecting right eye. Rhinitis." (Exhibits 1 and 1-H.) Again, Mr. Stevenson makes no reference to Dr. Brown about having any problems with his teeth. (Exhibit 1.)

63.    The patient returned on August 1, 2006, again with respect to his orthopedic complaints. (Exhibits 1 and 1-H.) The Plaintiff was seen on September 17, 2006 with respect to a rash on his inner arms. (Exhibits 1 and 1-I.)

64.    Mr. Stevenson was seen by medical staff on October 2 and October 19. On neither occasion did he make reference to any dental issues. (Exhibits 1 and 1-K.)

65.    On October 3, 2006 and October 21, 2006, Mr. Stevenson refused to be seen by the nurses. (Exhibits 1, 1-K, and 1-L.)

66.    On October 30, 2006, Mr. Stevenson was seen by Dr. Brown and was noted to weigh 252 pounds. There is no indication in this record that Mr. Stevenson was losing weight as a result of any medical condition. This is the first instance that Dr. Brown indicates that Mr. Stevenson has

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

dental problems and specifically notes "dental caries" as a condition complained of.  (Exhibits 1 and 1-L.)

67.    On November 13, 2006, Mr. Stevenson complained of knots on both sides of his jaws below his earlobes.  Again, no complaints regarding his teeth or mouth.  (Exhibits 1 and 1-L.)

68.    Caries are cavities.  Cavities are not gingivitis.  (Exhibit 1.)

69.    Mr. Stevenson did present to Dr. Brown on December 11, 2006 with complaints of his gums bleeding despite flossing.  (Exhibits 1 and 1-M.)

70.    His weight on that date was 257 pounds.  (Exhibits 1 and 1-M.)

71.    Between January of 2007 and August of 2007 when Mr. Stevenson received his root scaling and planing, there are no references in the medical records to suggest that Mr. Stevenson was complaining of any problems attributable to his gums or teeth.  (Exhibit 1 and Group Exhibit N.)

72.    In addition, at the time Mr. Stevenson was seen again by Dr. Scholz in July of 2007, his medical records reflect that he weighed 257 pounds.  (Exhibits 1 and 1-O.)

73.    There is nothing in the records to suggest that Mr. Stevenson's weight loss was due to anything but his personal desire to lose weight after Dr. Brown advised him to do so in June of 2006, at which time he weighed 263 pounds.  By the time he received his root scaling and planing, Mr. Stevenson had lost a mere six pounds and not the twenty pounds he suggests.  Regardless, Dr. Brown's note suggests that Mr. Stevenson needed to lose approximately a hundred pounds as an aid to his prior medical problems.  (Exhibit 1.)

74.    In January of 2008, Mr. Stevenson was transferred to the Illinois River Correctional Center in good condition and he appeared to be quite healthy.  (Exhibit 1.)

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

75.    As Mr. Stevenson is no longer incarcerated at the Western Illinois Correctional Center, Dr. Scholz no longer cares for any of his dental problems and has not seen him since the date of his transfer.  (Exhibit 1.)

76.    As of January 29, 2008, Mr. Michael Stevenson has been incarcerated at the Illinois River Correctional Center and had been there for approximately three weeks. (Plaintiff's deposition, p. 3, ll. 7-14.)

77.    Prior to that time, Mr. Stevenson had been incarcerated at the Western Illinois Correctional Center from approximately May of 2005 until his transfer to the Illinois River Correctional Center. (Plaintiff's deposition, p. 3, ll. 15-20.)

78.    Mr. Stevenson cannot recall the last time he saw a dentist before his incarceration in the Cook County Jail, which took place approximately eleven months before being transferred to the Western Illinois Correctional Center. (Plaintiff's deposition, p. 4, ll. 1-21.)

79.    Plaintiff asserts that the first time he was diagnosed with gingivitis was July 5, 2006, which was also the first time that he saw Dr. Scholz. (Plaintiff's deposition, p. 5, ll. 14-19.)

80.    Before July 5, 2006, Mr. Stevenson had seen no other dentist at the Western Illinois Correctional Center. (Plaintiff's deposition, p. 5, ll. 20-23.)

81.    Plaintiff has no understanding as to how long he suffered from gingivitis. (Plaintiff's deposition, p. 7, ll. 11-13.)

82.    Before being incarcerated, Plaintiff admits that he brushed his teeth about once a day. (Plaintiff's deposition, p. 7, ll. 14-17.)

83.    Before his most recent incarceration, Plaintiff had his teeth professionally cleaned by a dentist on two prior occasions. (Plaintiff's deposition, p. 8, ll. 1-10.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

84.     Plaintiff has not ever had his teeth cleaned when he was not in prison or jail. (Plaintiff's deposition, p. 8, ll. 20-23.)

85.     Plaintiff's claim against Dr. Scholz relates to Plaintiff's request for treatment for his gingivitis. (Plaintiff's deposition, p. 9, ll. 23-24; p. 10, ll. 1-12.)

86.     Dr. Scholz advised Mr. Stevenson that there were other patients who had more severe problems than his gingivitis which required his attention. (Plaintiff's deposition, p. 10, ll. 17-23.)

87.     As of the time Plaintiff's deposition was taken, Dr. Scholz had treated Mr. Stevenson's gingivitis with a scaling and root planing. (Plaintiff's deposition, p. 11, ll. 8-11.)

88.     Plaintiff alleges that his gums were swollen and that he could not eat due to his gingivitis.  Plaintiff also claimed of pain and temperature sensitivities. (Plaintiff's deposition, p. 11, ll. 14-24.)

89.     Plaintiff understands his gums were swollen because of the gingivitis. (Plaintiff's deposition, p. 12, ll. 1-3.)

90.     Plaintiff began flossing his teeth after July 5, 2006. (Plaintiff's deposition, p. 12, ll. 6-7.)

91.     Plaintiff did not lose any teeth as a result of his gingivitis. (Plaintiff's deposition, p. 12, ll. 23-24.)

92.     Plaintiff has no current problems associated with his teeth. (Plaintiff's deposition, p. 14, ll. 2-4.)

93.     Plaintiff no longer treats with Dr. Scholz since he has been transferred to the Illinois River Correctional Center. (Plaintiff's deposition, p. 14, ll. 5-20.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

94.     Plaintiff claims that his problems got worse between July 5, 2006 and July of 2007. (Plaintiff's deposition, p. 14, ll. 5-17.)

95.     Dr. Scholz performed a scaling and root planing procedure sometime after August of 2007. (Plaintiff's deposition, p. 17, ll. 1-8.)

96.     Plaintiff has had teeth pulled in the past. (Plaintiff's deposition, p. 18, ll. 10-11.)

97.     Plaintiff believes these teeth were pulled when one was cracked and had a wisdom tooth pulled because it grew in the wrong direction. (Plaintiff's deposition, p. 18, ll. 10-24.)

98.     One of these teeth Plaintiff pulled out himself. (Plaintiff's deposition, p. 19, ll. 13-17.)

99.     At the time Plaintiff's deposition was taken in January of 2008, his gums were not swollen. (Plaintiff's deposition, p. 20, ll. 4-5.)

100.     He no longer has bleeding of his teeth. (Plaintiff's deposition, p. 20, ll. 6-7.)

101.     Plaintiff claims he lost some weight. (Plaintiff's deposition, p. 13, ll. 1-2.)

102.     Plaintiff did not gain back the weight he had lost, but he did not want to gain this weight back. (Plaintiff's deposition, p. 20, ll. 6-11.)

103.     Plaintiff admits that he looks better and feel better now that he has lost some weight. (Plaintiff's deposition, p. 20, ll. 12-14.)

104.     Plaintiff has no other medical conditions. (Plaintiff's deposition, p. 20, ll. 20-24; p. 21, ll. 1-3.)

105.     Plaintiff claims that he also had headaches.  However, he admits that no physician has related his headaches to his teeth. (Plaintiff's deposition, p. 22, ll. 20-22.)

106.     Plaintiff describes his mouth during the time that he suffered from gingivitis as having red, swollen gums and blood in his mouth. (Plaintiff's deposition, p. 50, ll. 1-24; p. 51, ll. 1-3.)

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

107.    At the present time, these problems have gone away since Dr. Scholz performed the root planing and scaling and provided him with antibiotics. (Plaintiff's deposition, p. 51, ll. 4-16.)

### III.  APPLICABLE LAW

**A.    Summary Judgment Standard.**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a Motion for Summary Judgment, the court must look beyond the pleadings and assess the proof to determine whether or not there is a genuine need for a trial.  If defendants meet their burden in showing there is an absence of evidence to support plaintiff's claim, plaintiff must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial.  Celotex Corp. v Catrett, 477 U.S. 317, 324-25, 106 S.Ct. 254, 91 L.Ed.2d 265 (1986).  In determining and evaluating a Motion for Summary Judgment, the court views the evidence in the light most favorable to the opposing party and draws all justifiable inferences in his favor.  A mere scintilla of evidence in support of plaintiff's position is not sufficient to create a genuine issue of material facts.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c); Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In the instance where there is an absence of evidence to support a non-moving party's case, the burden shifts to the non-movant to set forth

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

14

05415-R4178
TMP/ej

specific facts showing that there is a genuine issue for trial. See, Celotex, 477 U.S. at 325; see also, Federal Rule of Civil Procedure 56(e); Outlaw, 259 F.3d at 837. A non-moving party may not rest on its pleadings, but must demonstrate that there is some admissible evidence that would support his or her position. Tolle v. Carroll Touch, Inc., 23 F.3d 174, 178 (7th Cir. 1994).

**B.     Defendant Scholz Is Entitled to Summary Judgment as There Are No Genuine Issues of Material Fact Which Would Establish That His Care and Treatment Constitutes Deliberate Indifference to a Serious Medical Need.**

In order to make a claim under the Eighth Amendment for failure to provide adequate medical treatment, an inmate must demonstrate that his condition is objectively serious and that the defendant was subjectively deliberately indifferent to that condition. Estelle v. Gamble, 429 U.S. 97, 104-105 (1976); see also, Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997).

Serious medical needs are those conditions that are life threatening or that carry risks of permanent serious impairment if left untreated. Gutierrez, 111 F.3d at 1371-73. Defendants must acknowledge that the Seventh Circuit has previously found that dental care is one of the most important medical needs of inmates. See, Wynn v. Southward, 251 F.3d 588, 593 (7th Cir. 2001). Other courts in other jurisdictions have held that dental pain accompanied by various degrees of medical harm may constitute an objectively serious medical need. See, Fields v. Gander, 734 F.2d 1313, 1314-15 (8th Cir. 1984); see also, Penrod v. Zavaras, 94 F.3d 1399, 1406 (10th Cir. 1996).

Defendant is also aware that the Seventh Circuit has recognized that periodontal disease can be considered a serious medical condition. See, Board v. Farnam, 394 F.3d 469, 480 (7th Cir. 2005).

In Board v. Farnam, the court indicated in a footnote that it was aware that risks are posed by tooth loss which may result from the most common form of periodontal disease, gingivitis. The

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

15

05415-R4178
TMP/ej

court further indicates that periodontal diseases are believed to sometimes contribute to cardiac conditions and/or blood infections.  Farnam, 394 F.3d 469, 480 (7th Cir. 2005).

However, the facts in this case are distinguishable from Farnam and Wynn.  In this case, there is no dispute that Mr. Stevenson presented to the dentist, Dr. Scholz, in July of 2006 with complaints concerning his gums.  At that time, Dr. Scholz diagnosed Mr. Stevenson as having periodontal disease in the form of moderate gingivitis.  He did not consider Mr. Stevenson's condition to be emergent and has indicated by and through his Affidavit that the condition as presented to him on that date did not constitute a Category 1 condition.  Mr. Stevenson's gingivitis did not pose a risk of substantial harm.

In addition, Dr. Scholz advised Mr. Stevenson that his recommendation for treatment was a dental cleaning, which he was not in a position to provide given that there were many other patients who were in need of dental care that he would consider to be of a more emergent nature pursuant to the Administrative Directives of the Department of Corrections.

These Administrative Directives from the Department of Corrections categorize dental needs and conditions as Levels 1 through 6.  (See Administrative Directives applicable to inmates within the Illinois Department of Corrections attached hereto as Exhibit 2.)  These Administrative Directives require that dental care be provided in the order of seriousness.

There is no medical evidence to indicate that Mr. Stevenson's form of gingivitis had risen to a level that posed a threat of serious harm to his present health or to his future health.  Subsequent to the initial visit with Dr. Scholz, Dr. Scholz eventually did provide a root scaling and planing procedure to address Mr. Stevenson's condition.

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

In general, dentists do not provide dental cleanings, which take a significant amount of time, when there are other patients who have more serious problems that need to be addressed.

Unfortunately, inmates tend to have many needs given their poor dental hygiene as a group.

The Plaintiff in this case admits in his deposition that after he received the root scaling and planing, he had no further problems relating to his gums. Mr. Stevenson did not lose any of his teeth and did not suffer from any medical conditions attributable to his gingivitis. Although Plaintiff suggested that he had headaches which he may have attributed to his gingivitis, neither the medical physician nor Dr. Scholz attributed Plaintiff's complaints to the dental issues. In fact, Dr. Scholz did not believe the patient's medical complaints were in any way related to his dental issues.

Dr. Scholz saw Mr. Stevenson on a limited number of occasions with respect to his complaints. Dr. Scholz provided Mr. Stevenson with accurate information concerning his diagnosis and the severity of his condition as compared to the problems of other inmates within the facility.

Mr. Stevenson's cause of action is based upon his preference that his moderate gingivitis be treated immediately in a fashion that he prefers. Inmates, however, are not entitled to receive a specific course of care. The Eighth Amendment prohibits cruel and unusual punishment. It does not mandate that prisoners be provided with the best treatment available or the treatment of their choosing. Anderson v. Romero, 72 F.3d 518, 524 (7th Cir. 1995).

Accordingly, Defendant Scholz is entitled to summary judgment as there are no genuine issues of material fact regarding care and treatment provided to Mr. Stevenson in this case. The facts establish that Mr. Stevenson presented to Dr. Scholz, at which time Dr. Scholz diagnosed the patient with moderate gingivitis. Dr. Scholz was hired to perform dental care and not to provide dental cleanings. Pursuant to the administrative directives, Dr. Scholz took care of those patients who had

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

17

05415-R4178
TMP/ej

the most emergent needs first. In addition, Dr. Scholz advised Mr. Stevenson of certain alternatives he may want to try in an effort to obtain professional cleanings which were not available at the Western Illinois Correctional Center. The Eighth Amendment does not require individuals to perform functions outside of their job descriptions and job duties.

## C.    Delay in Receiving Medical Treatment

The Plaintiff is claiming that he suffered injury as a result of the delay in obtaining a root scaling and planing. In order to set forth a cause of action based upon a delay in receiving medical treatment, Plaintiff must establish through medical evidence that he suffered an injury as a result of the delay.

Dr. Scholz cannot be required to work more hours than exist in order to complete all dental work that may appear to be needed following his examination of each inmate. Prioritizing care based on the degree of medical need should be encouraged. The current process allows the dentists to examine patients to identify all dental needs and then to address those needs based on the level of need. Requiring a dentist to treat all conditions simply because he knows they exist would put patients with more serious conditions at true risk of unnecessary pain and suffering.

An inmate who complains that a delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. Langston v. Peters, 100 F.3d 1235, 1240 (7th Cir. 1996)(quoting Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995)).

In this case, there is no medical evidence to indicate that Mr. Stevenson should have been treated with a root scaling and planing at any time prior to July or August of 2007 when Dr. Scholz recommended and ultimately performed this procedure. As is documented in Dr. Scholz's Affidavit,

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

root scaling and planing is not the first course or line of treatment for someone initially diagnosed with periodontal disease in the form of gingivitis. Oral hygiene at home is the normal course of treatment for this condition. Plaintiff was advised on more than one occasion of proper oral hygiene techniques. Unfortunately, these techniques were not effective for Mr. Stevenson. Eventually, it appeared to Dr. Scholz that a more invasive procedure would be helpful to treat his condition. This decision was made when Mr. Stevenson presented to Dr. Scholz again in July of 2007. Prior to that time, Dr. Scholz did not have the opinion that such a procedure was medically indicated.

In addition, the Plaintiff's medical records do not suggest that Mr. Stevenson was suffering from serious medical conditions attributable to his swollen gums. In fact, there are little to no references to his gum problems or periodontal disease in the medical records. In contrast to the Plaintiff's testimony concerning his medical condition during the time that he suggests that he suffered from periodontal disease (beginning on July 5, 2006), the Plaintiff's first issue with respect to medical problems concerns an orthopedic issue on July 21, 2006. There is no documentation concerning the patient's mouth on that date.

**D.      Qualified Immunity**

To the extent the Court may find there to be an issue of fact as to whether or not Dr. Scholz should have provided care and treatment to Mr. Stevenson sooner than he did, Dr. Scholz is entitled to qualified immunity in relying upon the administrative directives in determining the order of treatment. Defendant Scholz would have no reason to believe that relying upon the administrative directives to determine the order of care would constitute a violation of an inmate's constitutional rights.

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

19

05415-R4178
TMP/ej

Qualified immunity protects such officials performing discretionary functions who are sued in their individual capacities against liability for monetary damages so long as their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Behrens v. Pelletier, 516 U.S. 299, 305 (1996), *quoting* Harlow v. Fitzgerald, 457 U.S. 800, 818 (1992). It is the Plaintiff's burden to show that the record supports a finding of an unconstitutional act and that the applicable constitutional standards were clearly established at the time in question once the Defendant raises qualified immunity as a defense. See, Scarver v. Litscher, 371 F. Supp.2d 986, 1004-1005, *citing* Tun v. Whitticker, 398 F.3d 899, 901-902 (7th Cir. 2005); Newsome v. McCabe, 319 F.3d 301, 303 (7th Cir. 2003); Magdziak v. Byrd, 96 F.3d 1045, 1047 (7th Cir. 1996).

Inmates come to the Illinois Department of Corrections with dental issues. These issues include a broad spectrum of problems from minor decay to severe abscesses which may lead to the need for extractions, dentures, fillings, and more. There are a limited number of dentists employed to address the needs of an ever-increasing prison population. The individual dentists are required to follow the Administrative Directives of the Illinois Department of Corrections by addressing the needs of inmates according to the severity of each patient's condition. In doing so, those with the most emergent needs are addressed first. Unfortunately, this requires others to wait their turn.

Until the Court rules that the system of prioritizing care is unconstitutional, the individual dentists and dental staff who follow this system when providing care should be granted qualified immunity.

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

## IV.  CONCLUSION

There are no genuine issues of material fact in this case.  The Plaintiff presented particular issues to Dr. Scholz.  Dr. Scholz evaluated Mr. Stevenson's condition and provided a diagnosis.  Dr. Scholz advised Mr. Stevenson of his opinions regarding personal oral hygiene and proper ways to address the condition on his own.  Dr. Scholz recommended to Mr. Stevenson that he obtain a transfer to another facility that may have better access to more dental care.  Plaintiff testified in his deposition that he attempted to follow the instructions provided to him.  He looked into obtaining a transfer, but was not successful in obtaining one.  The oral hygiene procedures he followed apparently did not address the problem to his satisfaction.  Ultimately, Mr. Stevenson returned to Dr. Scholz and received a root scaling and planing which did alleviate all of the symptoms of which he complained previously.  There is nothing in the medical records, nor in the dental records, to indicate that Dr. Scholz was aware of any problems other than those presented to him on the dates of his few visits with Mr. Stevenson.

Accordingly, Defendant is entitled to judgment as a matter of law as there are no genuine issues of material fact to be determined by a jury at the time of trial.

Respectfully submitted,

ROBERT SCHOLZ, D.D.S., Defendant,

HEYL, ROYSTER, VOELKER & ALLEN, Attorneys for Defendant,

BY:     /s/Theresa M. Powell
        Theresa M. Powell, #6230402
        HEYL, ROYSTER, VOELKER & ALLEN
        Suite 575, National City Center
        P. O. Box 1687
        Springfield, IL  62705
        Phone: (217) 522-8822
        Fax:     (217) 523-3902

**HEYL ROYSTER**
**VOELKER**
**& ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

21

05415-R4178
TMP/ej

E-mail:tpowell@hrva.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2008, I electronically filed **Motion for Summary Judgment**

with the Clerk of Court using the CM/ECF system which will send notification of such filings(s) to

the following:

Ellen C. Bruce
ebruce@atg.state.il.us

and I hereby certify that on April 15, 2008, I mailed by United States Postal Service, the document(s)

to the following non-registered participants:

Michael Stevenson, N93569
Illinois River Correctional Center
Route 9 West
P. O. Box 1900
Canton, IL 61520

/s/Theresa M. Powell
Theresa M. Powell, #6230402
HEYL, ROYSTER, VOELKER & ALLEN
Suite 575, National City Center
P. O. Box 1687
Springfield, IL 62705
Phone: (217) 522-8822
Fax:     (217) 523-3902
E-mail:tpowell@hrva.com

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

MICHAEL STEVENSON, N93569,        )
                                  )
            Plaintiff,            )
                                  )
      v.                          )       No. 07-3108-HAB-CHE
                                  )
SCHOLZ, R. ZIMMERMAN, RODGER E.   )
WALKER, JR., MELODY FORD, D.      )
FUQUA, TARA GOINS, and VAN STRIEN.)
                                  )
            Defendants.           )

STATE OF ILLINOIS        )
                         ) SS.
COUNTY OF _____    )

**AFFIDAVIT**

I, ROBERT SCHOLZ, D.D.S., being first duly sworn upon my oath, soundly affirm the

following statements:

1.      I am a dentist licensed to practice in the State of Illinois.

2.      At certain times relevant to the Plaintiff's Complaint, I worked at the Western Illinois

Correctional Center.

3.      I relied on Plaintiff's medical records in preparation of this Affidavit for referencing

the dates I saw Mr. Stevenson.

4.      According to Plaintiff's medical records, it appears that he was screened and oriented

to the Western Illinois Correctional Center in May of 2006.  (Exhibit A.)

5.      In general, I would not be advised of Plaintiff's medical complaints which were no

dental related.  These complaints would be directed to the nursing staff and potentially to the

Medical Director.

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

**EXHIBIT 1**

05415-R4178
TMP/ej

6.    Unless the nurse or physician referred the patient to the dental office following a complaint, I would not be made aware of complaints concerning an inmate's mouth.

7.    The first reference in the medical records to any problems regarding the patient's mouth appears on December 11, 2006. According to Dr. Brown's note, the patient reported that his gums were bleeding despite flossing. Dr. Brown's note indicates that he would discuss this with dental. (Exhibit B.)

8.    There do not appear to be any additional medical complaints concerning the patient's mouth or teeth in the Plaintiff's medical file.

9.    In the course of my practice as a dentist at the Western Illinois Correctional Center, I did see an inmate by the name of Michael Stevenson. His dental records attached hereto include Exhibits C and D.

10.    Exhibit C identifies that Mr. Stevenson did have moderate periodontal disease when I saw him in July of 2006.

11.    Notes of my care and treatment from July 5, 2006 through September 12, 2007 are shown on Exhibit D.

12.    On July 5, 2006 at 8 a.m., Mr. Stevenson came to see me for complaints of bleeding gums. I diagnosed him with moderate gingivitis and he was provided with oral hygiene instructions. (Exhibit D.)

13.    On August 6, 2006, Plaintiff returned complaining of problems with his gums from food getting packed between his teeth. Plaintiff was wanting a cleaning. Oral health instructions were given to him. (Exhibit D.)



HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

2

05415-R4178
TMP/ej

14.    At that time, I explained to Mr. Stevenson that dentists did not provide cleanings and there was no dental hygienist at Western Illinois Correctional Center to perform that function.

15.    In my practice as one of the dentists at the Western Illinois Correctional Center, I took care of inmates' teeth in the order of worst to best. Mr. Stevenson did not have a significantly serious condition to warrant immediate treatment for his complaints. There were many other inmates who had immediate and emergent problems that needed to be addressed first.

16.    The Department of Corrections has Administrative Directives which categorize dental problems from Category I to Category VI.

17.    Mr. Stevenson's moderate gingivitis was not a Category I condition.

18.    I would have considered his gingivitis to be a Category III or Category II condition.

19.    At the time I first saw Mr. Stevenson, I explained to him my need and requirement to provide care and treatment to those patients who suffered Category One conditions first.

20.    I advised Mr. Stevenson that he needed to practice good oral hygiene and by doing so, his teeth would be cleaner in order to halt and prevent worsening of his condition.

21.    On October 3, 2006, Mr. Stevenson came back to the dental unit again asking for a cleaning. I advised him that him his teeth were not bad enough to warrant bumping off or fillings. I suggested that he ask for a transfer. (Exhibit D.)

22.    On October 3, 2006, I explained to Mr. Stevenson that the Western Illinois Correctional Center did not have a dental hygienist but that other facilities may have one. He may possibly be able to get his teeth cleaned there in an effort to treat or prevent worsening of his gingivitis.



HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

3

05415-R4178
TMP/ej

23.    On October 24, 2006, Mr. Stevenson appeared in the dental unit but was not seen by me.

24.    On December 19, 2006, I responded to a grievance regarding Mr. Stevenson's complaints that I was not treating his dental health appropriately. I advised him that his gingivitis was not emergent. (Exhibit D.)

25.    Mr. Stevenson complained of terrible pain, headaches, and severe bleeding. I noted that on examination, there was no objective evidence to verify the complaints made by the Plaintiff in his grievance. I found no dental reason to be causing Plaintiff's complained of pain or headaches. I saw no severe bleeding.

26.    Again, I explained and provided Mr. Stevenson with oral health information.

27.    The next time I saw Mr. Stevenson was on July 31, 2007. At that time, I examined Mr. Stevenson's gums and determined that I would perform a deep scaling and root planing in an effort to address his gingivitis.

28.    These procedures were performed on August 8, 2007. (Exhibit D.)

29.    I examined Mr. Stevenson's gums again on September 12, 2007. At that time, his gums looked much better than they had before. (Exhibit D.)

30.    At that time, I determined that Mr. Stevenson's complaints regarding his gums were resolved. His periodontal disease in the form of gingivitis was under control and that with proper oral hygiene, Mr. Stevenson should not have significant problems.

31.    So long as Mr. Stevenson maintains proper oral hygiene, he should not have any medical problems relating to gingivitis.

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

32.     At no time did I consider Mr. Stevenson's gingivitis to be a serious medical need in need of immediate medical treatment.

33.     I considered Mr. Stevenson's gingivitis to be moderate. This level of gingivitis did not, in and of itself, create a risk of substantial harm to Mr. Stevenson.

34.     In my opinion, Mr. Stevenson's complaints of pain and headaches were not related to his periodontal disease at any time. These are medical conditions which should have been, and could have been treated by a physician and not by a dentist.

35.     With respect to Mr. Stevenson's complaints of bleeding, this is a common condition associated with poor oral hygiene. Bleeding is not painful and often occurs in gums where an individual has not maintained proper oral hygiene.

36.     Bleeding gums and periodontal disease do not prevent someone from being able to eat.

37.     At no time did Mr. Stevenson ever suggest to me that he was having any difficulty eating.

38.     I prescribed Tetracycline, an antibiotic, on August 8, 2007 in conjunction with the root cleaning procedure I performed. (Exhibit E.)

39.     I again prescribed Tetracycline, an antibiotic, on September 12, 2007. (Exhibit F.)

40.     The next time I saw Mr. Stevenson was October 10, 2007. At that time, I noted that Mr. Stevenson's gums continued to look good. (Exhibit G.)

41.     I saw Mr. Stevenson again on October 24, 2007. I provided him with 30 more tablets of an antibiotic to address any threat of infection from the presence of any possible bacteria that may



HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

5

05415-R4178
TMP/ej

have been present in Mr. Stevenson's mouth at or near the site of the area where I conducted the

deep scaling procedure on August 8, 2008. (Exhibit G.)

42.     In my opinion, Mr. Stevenson's gingivitis was progressing appropriately and

satisfactorily.

43.     His condition did not pose a risk of substantial harm to his health at any time.

44.     Shortly thereafter, it appears that Mr. Stevenson was transferred to the Illinois River

Correctional Center.  I do not provide dental services at that facility.  I no longer am in contact with

Mr. Stevenson and have no knowledge regarding the current status of his gingivitis and/or his gums

or teeth.

45.     As of the time that he left my care, his gums were in satisfactory condition.

46.     Gingivitis in Mr. Stevenson's form was not an emergent medical need, nor was it the

type of condition that was at imminent risk of causing him substantial harm.

47.     I am aware of no medical conditions caused by Mr. Stevenson's gingivitis.

48.     Gingivitis is a periodontal disease.  This condition is common in the general

population and is even more common to inmates.

49.     Inmates, in general, tend to have poor dental hygiene which contributes to the

development of gingivitis.

50.     Gingivitis is caused by and is aggravated by a buildup of plaque and/or tartar on the

gums and teeth which, if it is not removed, may cause the condition to progress.

51.     There are various forms of gingivitis from mild to severe.

52.     Mr. Stevenson suffered from moderate gingivitis.

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

53.     Gingivitis in its most severe form can contribute to the development of serious medical issues.

54.     However, Mr. Stevenson's gingivitis had not risen to a level which could pose a risk of harm to Mr. Stevenson's overall health status.

55.     The root planing and scaling performed in August of 2007 addressed the gingivitis and prevented Plaintiff from developing any medical complications from his then-present form of gingivitis.

56.     The complaints of bleeding and swollen gums made by Mr. Stevenson were alleviated with this procedure.

57.     Not all individuals who suffer from gingivitis require a root planing and scaling procedure.

58.     Most individuals can be treated with dental cleanings, when available.

59.     I do not consider gingivitis to be a condition which requires a consultation with an outside specialist.

60.     Bleeding is a common symptom from gingivitis.

61.     The common form of treatment for gingivitis is proper dental hygiene. In most cases, proper dental hygiene and cleanings can halt the progression of gingivitis.

62.     The antibiotics given to Mr. Stevenson were provided in association with the root planing and scaling and this procedure may allow bacteria to travel deep into the gums where the procedure took place. The antibiotics are given to prevent an infection from developing during that time frame.

63.     Antibiotics are not required as a standard of care to address bleeding gums.

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

64.    Overuse of antibiotics may actually create greater risks of harm for patients who have no medical need for those specific medications.

65.    In the course of this case, I have reviewed medical records in search of evidence regarding Mr. Stevenson's overall health from July 2006 through August of 2007.

66.    It should be noted that before July 5, 2006 (the date of my visit with Mr. Stevenson), the last time Plaintiff was weighed was June 19, 2006. (Exhibit J.) At that time, Mr. Stevenson was seen by Dr. Brown for complaints of his left foot, the orthopedic problems. Plaintiff had been complaining of ankle pain, which was now less swollen as he walked. Dr. Brown's note states, "Lose 100 pounds" for the plan. (Exhibit J.) The next time Plaintiff was weighed was July 21, 2006. (Exhibit H.) At this time, he weighed 255 pounds. He had already lost eight pounds. There is nothing in the records to indicate that this was a result of his dental issues. In fact, Dr. Brown's record from July 21, 2006 states, "Is losing weight purposely. The orthopedic issue is resolving favorably, but he has pesky nasal allergies affecting right eye. Rhinitis." (Exhibit H.) Again, Mr. Stevenson makes no reference to Dr. Brown about having any problems with his teeth.

67.    The patient returned on August 1, 2006, again with respect to his orthopedic complaints. (Exhibit H.) The Plaintiff was seen on September 17, 2006 with respect to a rash on his inner arms. (Exhibit I.)

68.    Mr. Stevenson was seen by medical staff on October 2 and October 19. On neither occasion did he make reference to any dental issues. (Exhibit K.)

69.    On October 3, 2006 and October 21, 2006, Mr. Stevenson refused to be seen by the nurses. (Exhibits K and L.)



HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

70.    On October 30, 2006, Mr. Stevenson was seen by Dr. Brown and was noted to weigh 252 pounds. There is no indication in this record that Mr. Stevenson was losing weight as a result of any medical condition. This is the first instance that Dr. Brown indicates that Mr. Stevenson has dental problems and specifically notes "dental caries" as a condition complained of. (Exhibit L.)

71.    On November 13, 2006, Mr. Stevenson complained of knots on both sides of his jaws below his earlobes. Again, no complaints regarding his teeth or mouth. (Exhibit L.)

72.    Caries are cavities. Cavities are not gingivitis.

73.    Mr. Stevenson did present to Dr. Brown on December 11, 2006 with complaints of his gums bleeding despite flossing. (Exhibit M.)

74.    His weight on that date was 257 pounds. (Exhibit M.)

75.    Between January of 2007 and August of 2007 when Mr. Stevenson received his root scaling and planing, there are no references in the medical records to suggest that Mr. Stevenson was complaining of any problems attributable to his gums or teeth. (Group Exhibit N.)

76.    In addition, at the time Mr. Stevenson was seen again by me in July of 2007, his medical records reflect that he weighed 257 pounds. (Exhibit O.)

77.    There is nothing in the records to suggest that Mr. Stevenson's weight loss was due to anything but his personal desire to lose weight after Dr. Brown advised him to do so in June of 2006, at which time he weighed 263 pounds. By the time he received his root scaling and planing, Mr. Stevenson had lost a mere six pounds and not the twenty pounds he suggests. Regardless, Dr. Brown's note suggests that Mr. Stevenson needed to lose approximately a hundred pounds as an aid to his prior medical problems.



HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-R4178
TMP/ej

78.     In January of 2008, Mr. Stevenson was transferred to the Illinois River Correctional Center in good condition and he appeared to be quite healthy.

79.     As Mr. Stevenson is no longer incarcerated at the Western Illinois Correctional Center, I no longer care for any of his dental problems and have not seen him since the date of his transfer.

80.     I make this Affidavit based upon my recollection and the medical records attached hereto.

81.     Each of the records referenced was kept in the ordinary course of business.

82.     I relied upon these records not only in making this Affidavit, but in treating Mr. Stevenson.

        Further Affiant Sayeth Not.

                                        _____
                                        ROBERT SCHOLZ, D.D.S.


Subscribed and Sworn to before me this
_10th_ day of _April_____, 2008.

_____
Notary Public

"OFFICIAL SEAL"
Bruce J. Jacobson
Notary Public, State of Illinois
My Commission Exp. 08/24/2009

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

**\*BEGIN USING FROM BOTTOM UP**

WKA    2B14

**State of Illinois**
**Dept. of Corrections**

**PRESCRIPTION ORDER**
**Chart Copy (Not a prescription)**

Patient _Stevenson, Michael_    Reg. # _N 93569_    Date: _12-11-06_

Problem _____

ORDER: (Physician's Signature After Last Order) _____

_Coal Tar Sh. x 7 m_

DEA/Illinois Lic. # _____    Physician (Print) _____
☐ May Substitute _____    M.D.
☐ May Not Substitute _Brown mr_    M.D.
DCA 7000    Noted by: _Hazelrigg D_    Date: _12-11-6_
IL 426-1417

---

NKA    2B14    profile only

**State of Illinois**
**Dept. of Corrections**

**PRESCRIPTION ORDER**
**Chart Copy (Not a prescription)**

Patient _Stevenson, Michael_    Reg. # _N93569_    Date: _10-2-06_

Problem _rash_

ORDER: (Physician's Signature After Last Order) _____

_Selsun lotion: apply to trunk + limbs. Wash off 12 h later. Repeat + week_

DEA/Illinois Lic. # _____    Physician (Print) _____
☐ May Substitute _____    M.D.
☐ May Not Substitute _Brown mr_    M.D.
DCA 7000    Noted by: _CMall_    Date: _10/2/06_
IL 426-1417

---

KnA    1C19

**State of Illinois**
**Dept. of Corrections**

**PRESCRIPTION ORDER**
**Chart Copy (Not a prescription)**

Patient _Stevenson Michael_    Reg. # _N93569_    Date: _7/21/06_

Problem _rhinitis._

ORDER: (Physician's Signature After Last Order) _____

_CTM 4 mg bid x 4m_

DEA/Illinois Lic. # _____    Physician (Print) _____
☐ May Substitute

**EXHIBIT**

A

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Western Illinois Correctional Center**

Offender Information:

Stevenson          Michael          ID#: N93___
Last Name          First Name          MI

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 12/11/06 1:35 pm | MD SICK CALL<br>WT 257 BP 100/70 T 97¹ P 68-16 | |
| | The skin & gums. there is a scalp derm that has irritated a lymphadenopathy; the gums bleed despite flossing.<br>Pyorrhea; dermatitis. | Coal tar Sh___<br>Will discuss ē dental<br>See Me Jan 3 set<br>Noted 12/11/06 ___ |
| | N Burns MD | |
| 1-3-07 1:30 p | MD SICK CALL   Seg Visit<br>WT ___ BP ? T 97 P 72-16 - Oldrennen<br>S- Skin lesions, scalp & forehead<br>O- Pruritic; salmon colored.<br>A- Psoriasis<br>N Burns<br>noted Oldrennen<br>1-3-07   1:45 pm | N<br>Hytone 1% oint<br>See Me ī m. Octo___<br>2 ___ |

EXHIBIT
B

# STATE OF ILLINOIS — DEPARTMENT OF CORRECTIONS

nate/Student Name _

nate/Student I.D.#

ception Facility

Panorex

N93569  STEVENSON, MICHAEL
Age: 35          DOB: 11/21/1970
Race: BLK        Sex: M
NRC 04/21/2006              12
                         ely at R&C

Screening
DDS sig    *Q. J. McDaniel DDS*

Public Health Classification Screening Dates              Pathology

□ Schedule immediately at
   receiving institution
□ Schedule immediately at
   receiving institution

odontics
al Surgery
odontics
rative
sthetic

:eiving Inst. _

ntist _

te _

0

DICAL HISTORY AND REMARKS

| | Yes | No | Current Medication |
|---|---|---|---|

dic Vascular Disease
onary Disease/Asthma
bbes
apy
atitis
pies (type ___ )

EXISTING RESTORATIONS & MISSING TEETH

R
1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16
32 31 30 29 28 27 26 25 24 23 22 21 20 19 18 17
L

TREATMENT NEEDED · COMPLETED RESTORATIONS

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16
32 31 30 29 28 27 26 25 24 23 22 21 20 19 18 17

Treatment Needed and
Completed Restorations

EXHIBIT
C

ALL-STATE LEGAL®

R                    L
R                    L

DC 7126 (Rev. 10/87)
IL 426-0018

| Date | Service Rendered | D.D.S. Signature | Date | Service Rendered | D.D.S. Signature |
|------|------------------|------------------|------|------------------|------------------|

APR 21 2005

H&G EXAM PANX
OPA HYGIENE
INSTRUCTIONS GIVEN

(illegible handwritten dental record entries)

EXHIBIT

D

TRI-STATE LEGAL®

**\*BEGIN USING FROM BOTTOM UP**

3A3Z

**State of Illinois**
**Dept. of Corrections**

**PRESCRIPTION ORDER**
**Chart Copy (Not a prescription)**

Patient _Stevenson, Michael_ Reg. # _N 93569_ Date: _8/6/07_

Problem _Dental_

ORDER: (Physician's Signature After Last Order) _____

Tetracycline 500mg
30 Caps
1 cap daily 30 days

DEA/Illinois Lic. # _____ Physician (Print) _____ M.D.

☐ May Substitute
☐ May Not Substitute
Noted by: _____ Date: _8.8.7_

DCA 7000
IL 426-1417

---

NKA

1B17

**State of Illinois**
**Dept. of Corrections**

**PRESCRIPTION ORDER**
**Chart Copy (Not a prescription)**

Patient _Stevenson, Michael_ Reg. # _N 93569_ Date: _7/14/07_

Problem _RASH._

ORDER: (Physician's Signature After Last Order) _____

Aristocort 1% apply Bid
Triple AB apply x 2 weeks
Bid x 1 week

DEA/Illinois Lic. # _____ Physician (Print) _____ M.D.

☐ May Substitute
☐ May Not Substitute
Noted by: _6 tablets_ _Ulair RN_ Date: _7/14/07_

DCA 7000
IL 426-1417

---

**State of Illinois**
**Dept. of Corrections**

**PRESCRIPTION ORDER**
**Chart Copy (Not a prescription)**

Received
02 2007
Western Illinois Corr. Center
Medical Records Dept.

Patient _Michael Stevenson,_ Reg. # _N 93569_ Date: _5/1/07_

Problem _D/c Prozac_

ORDER: (Physician's Signature After Last Order) _____

Prozac 20 mg PO q HS. x 4 months.

**EXHIBIT**
**E**

DEA/Illinoi _____ Physician (Print) _____ M.D.
_____ M.D.

**\*BEGIN USING FROM BOTTOM UP**

State of Illinois
Dept. of Corrections

**PRESCRIPTION ORDER**
**Chart Copy (Not a prescription)**

Patient _____ Reg. # _____ Date: _____

Problem _____

ORDER: (Physician's Signature After Last Order) _____

DEA/Illinois Lic. # _____ Physician (Print) _____ M.D.
☐ May Substitute _____ M.D.
☐ May Not Substitute _____ Date: _____
DCA 7000      Noted by: _____
IL 426-1417

---

*NKA*
*3A32*

State of Illinois
Dept. of Corrections

**PRESCRIPTION ORDER**
**Chart Copy (Not a prescription)**

Patient _Stevenson, Michael_ Reg. # _N93569_ Date: _9/12/07_

Problem _____ _Dental_

ORDER: (Physician's Signature After Last Order) _Tetracycline 500mg_
_~~~~ @ 30 Caps_
_i tab per d_

DEA/Illinois Lic. # _____ Physician (Print) _____ M.D.
☐ May Substitute _____ M.D.
☐ May Not Substitute _____ Date: _9/12/0_
DCA 7000      Noted by: _B. Tatin LPN_
IL 426-1417

---

*R1*
*NKA*

State of Illinois
Dept. of Corrections

**PRESCRIPTION ORDER**
**Chart Copy (Not a prescription)**

Patient _Stevenson Michael_ Reg. # _N93569_ Date: _8/28_

Problem _Psych_

ORDER: (Physician's Signature After Last Order) _____
_Prozac 20mg q HS X 2 mo._

**EXHIBIT**

**F**

# _____ Physician (Print) _Dr Brian Ritter_
☐ _ay Substitute_ _____ M.D.
☐ _ay Not Substitute_ _____ M.D.
Noted by: _____ Date: _8/28_

| Date | D.D.S. Signature | Service Rendered |
|---|---|---|
| APR 21 2006 | | P&G EXAM, PANX, ORAL HYGIENE INSTRUCTIONS GIVEN |
| 6/15/06 | | R/o so DX's on 4teeth, 8 exm'n no complaint — need all 4 quadrants ext |
| 9/6/06 9:11am | | 7th q. no compl — providing with 2nd quadrant gum infection, tooth gutting closed, want them ext |
| 10/23/06 12:50p | | White Cleaning — not too advanced, pt improved, shd not, if not suggested deep th'x |
| 10/24/06 7:50 | | 4's/pr morning pp possible Mm'tb'p pss recommended to a gingival |
| 12/19/06 2:35pm | | A1# 04 03 1@2 Claims trouble ma't headaches and sever bleeding DSM examination pp AD obj re overbite o result th'x |

| Date | Service Rendered | D.D.S. Signature |
|---|---|---|
| 12/19/06 1:45 PM | Clean, perio health gums, chronic gingivitis etc. OHI again | |
| 7/3/07 0454 | Will do deep scaling + root planing | |
| 8/3/07 | Deep Scaling, no problem | |
| 8/3/07 2:25pm | exd | |
| | Tetracycline 500mg #30 1 tab daily 30day refills X1 | |
| | Refilled/issued 8/5/07 @ 2:35pm ⁄ w | |
| 9/12/07 | gums look much better | |
| 10/15/07 | gums look good | |
| 10/24/07 | Tetracycline 250mg 230 pt tab daily | |
| 12/24/07 2:45pm | | |
| 1-13-09 | c/o cut Rt teeth qt q 9 | |

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Outpatient Progress Notes

### Western Illinois Correctional Center

Offender Information:

Last Name: _Stevenson_    First Name: _Michael_    MI: ___    ID#: _N93569_

| Date/Time | Subjective, Objective, Assessment | Plans |
|-----------|-----------------------------------|-------|
| 7-18-06 | Nurse note: | |
| 10:45 AT | Ret'd from med furlough @ F/u | |
| | as needed. DSC F/u med | |
| | furlough for 7-21-06 ————— | 6 mgn |
| 7/21/6 | **MD SICK CALL** # 104 | |
| 9⁵⁰/K | WT 255 BP 116/60 T 97⁸ P 76 76 | |
| | Is losing weight purposely | |
| ℞ | the orthopedic issue is resolving | CTM 4 mg bid X 2 m |
| | favorably, but he has pesky nasal | |
| | allergies affecting ® eye. | |
| | Rhinitis | Noted 7/21/06 [signature] |
| | J. Brown MD | |
| | 7-21-06 F. Lewis LPN | |
| 8-1-06 | **NURSE NOTE** | |
| 1 p.m. | I/m returned air cast | |
| ℞ | to Drs office on med. | |
| | furlough of 7/18/06, verified | |
| | by Lt. Winston who trans- | |
| | ported I/m. | KB [signature] |

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

EXHIBIT

H

STATE LEGAL®

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Western Illinois Correctional Center**

Offender Information:

| Last Name | First Name | MI | ID#: N9356 |
|---|---|---|---|
| Stevens | Michael | | |

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 9/17/06 5¹⁰/A ⊄ | Nurse note S) For approx 1 mo has hase patches ⊙ inner arms & underarmpits O) T.96° wt 257 B/P 118/80 P.70 R.16  Areas are dry & patchy dime sized itches A) R/O Rash | P)$2 Copay Calamine lotion BID × 1 Bottle If not better return to HCU (AO ℞) |
| 9/28/06 5¹⁵/A ⊄ | Nurse note S) Above rash has spread "all over body" — Calamine didn't help! wants to try TAO til I'm can see M.D O) wt 257 B/P 120/72 – P.68 R.16 A) Spreading rash | P)$2 Copay TAO MD 10/2/06 (AO ℞) |

DOC 0084 (Eff. 9/20)
(Replaces DC 714

EXHIBIT

STATE LEGAL®

I

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Western Illinois Correctional Center**

Offender Information:

_Stevenson_          _Michael_                    ID#: N 9356?
Last Name            First Name          MI

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 6/19/06<br>9:15ₐ | MD SICK CALL<br>WT _263_ BP _146/80_ T _96⁵_ P _80_ R _14_ | C Mapron P. |
|  | L first. the lateral malleolar region<br>is now less swollen as he walks. Lab is not truly positive for ANA, R.F., but sed rate is up. | Lose 100 LB! |
|  | Ⓛ Ankle sprain, resolving. Obesity<br>                      C Bryon MD | meds<br>C Mapron<br>6/19/06<br>B. Eaton NP |
| 6-20-06<br>10:50 am | MD NOTE:<br>Ret'd from med specialist — to see us<br>Saw Morton who issued an<br>AIR STIRRUP. He walks well.<br>Strain, sprain.<br>                      M Brown MD | C Mapron<br>Ret 8-1-06 Yes<br>reevaluation.<br>DSC sch |

EXHIBIT
J

DOC 0084 (Eff. 9/20)
(Replaces DC 71)

E-FILED
Tuesday, 15 April, 2008 12:38:24 PM
Clerk, U.S. District Court, ILCD

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Western Illinois Correctional Center**

Offender Information:

| Stevenson | Michael | | ID#: N93569 |
|---|---|---|---|
| Last Name | First Name | MI | |

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 10-02-06 2³⁰ p | MD SICK CALL  WT 256, 138, 9½ P 73  R 18  88 | C Dupus |
| Q | Rash 1 m, truncal, pruritic  Oval, depigmented patches  T-Versicolor  Trlirow MD | Selsun lotion  noted 10/2/06  C Novell 4P |
| 10-3-06 4³⁰ Q | Nurse note  Refusal signed for AM NSC  Saw Hi this on 10-2-06 | F Rener LPN |
| 10/19/6 5³⁰ A Q | nurse note  S) I have been over here for  the same thing several times  the med didn't work that the  Doctor gave me sky rash is worse  0) wt 250 BP 148/86 P 84 T 97⁶  R 18 rash areas are on trunk  + under arm pitts, stomach, back | A) R/O Rash  P) $500 copay signed  problem is on going  reassurance given  DSC 10/03/6  S Ring LPN |

**EXHIBIT**

K

L-STATE LEGAL®

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

**ILLINOIS DEPARTMENT OF CORRECTIONS**

**Offender Outpatient Progress Notes**

**Western Illinois Correctional Center**

Offender Information:

Last Name: _Stevenson_   First Name: _Michael_   MI: ___   ID#: _B93569_

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 10-21-06 4:45ᴬ | Nurse Note Refusal signed for AM NSC — | B Bowles RN |
| 10/26/06 1:30 ᴾ | RN Note See medical Master NTE | [signature] |
| 10/30/06 10:15ᴬ | MD SICK CALL WT 252 BP 133/88 T 96.9 P 76 | |
| | the skin. Probably not TINEA. | Reassurance |
| | He is upset about treatment failures | |
| | and repeated outlay of money. | |
| | the pattern is "X-Mas tree". | |
| | P. Rosea | noted |
| | Dental caries | |
| 11/13/6 8:40 ᴾ | Nurse note | A) Alt in Comfort |
| | S) I have those Knots on both side | P) 8/300 Copay Signed |
| | of my jaws below my Rear lobes | DSC 11/15/6 |
| | O) BP 134/88 P 74 R 16 T 97¹ | RBC as Needed |
| | Knots noted below both Ear lubes | — SReul RN |

DOC-0084 (Eff. 9/2
(Replaces DC 71

**EXHIBIT**

STATE LEGAL®   L

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Western Illinois Correctional Center**

Offender Information:

Last Name: Stevenson    First Name: Michael    M    ID#: N935__

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 12/11/0 1 35 pm | MD SICK CALL WT 257# BP 100/70 T 97' P 68-16 | |
| | The skin & gums. there is a scalp derm that has united a lymphadenopathy; the gums bleed despite flossing. Pyonkes; dermatitis | Coal tar Sh Will discuss c dental See Me Jan 3 self J Brown MD |
| | | Noted 12/11/00 |
| 1-3-07 1 30 p | MD SICK CALL    Seg Visit WT ___ BP ? T 97 P 72 16 - V Brennan | Noted |
| | S - Skin lesions; scalp & forehead | Hytone 1% ant |
| | O - Pruritic; salmon colored | |
| | A - Psoriasis | See Me + m. October 2" M Brown MD Noted V Brennan 1-3-07 1 45 pm |

Distribution: Offender's Medical Record

DOC-0084 (Eff. 9/500) (Replaces DC 7147)

EXHIBIT
M
ILL-STATE LEGAL®

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Outpatient Progress Notes

### Western Illinois Correctional Center

Offender Information:

| Stevenson | Michael | | ID#: N93569 |
|-----------|---------|---|------------|
| Last Name | First Name | M/I | |

| Date/Time | Subjective, Objective, Assessment | Plans |
|-----------|-----------------------------------|-------|
| 1-9-07 3:00p | Medical Records Note:<br><br>Offender recieved copy of all Medical file per request. Non-disclosure for mental health Signed by offender MHP. Authorization form and money voucher signed by offender at this time ——— | J. Link 8RN |
| 2-7-7 8AM | WT 255 BP 136/74 T 98° P 74 R 20<br><br>S - Skin trouble. Believes it is stress related.<br><br>O - Mild lymphadenopathy. Gives a convincing conclusion over his innocence.<br><br>A - Psychogenic dermatitis | C. Thompson R.<br><br>See psych refferal done<br><br>Prozac 20.<br><br>noted C.Thompson |

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

**EXHIBIT**

GROUP
N

STATE LEGAL®

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

Western Correctional _____ Center

Offender Information:

| Stevenson, | Michael | | ID#: N 935 |
|---|---|---|---|
| Last Name | First Name | MI | |

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 3/29/07 | *Psych MD* | Received |
| | **PATIENT IS SEEN TODAY THROUGH TELEMEDICINE FOR DETAILS SEE IDOC 0282** | MAR 30 2007 |
| | | Western Illinois Corr. Center Medical Records Dept. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Distribution: Offender's Medical Record

DOC 0084 (Eff. 9/200?
(Replaces DC 7147

*Printed on Recycled Paper*

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Western Illinois Correctional Center**

Offender Information:

| Last Name | First Name | MI | ID#: |
|-----------|-----------|-----|------|
| Stevenson | Michael | | N9356 |

| Date/Time | Subjective, Objective, Assessment | Plans |
|-----------|-----------------------------------|-------|
| 2/27/07 | Psych Note | |
| 11³⁰ a | See mental health notes | Cynthia Lynn |
| 3/29/07 | Nurse Note | |
| 11³⁰ A | Thereson telepsych c̄ Dr | |
| | Khan. Permission form | |
| | signed —————— | Hd8 |
| 4/04/07 | Psych Note | |
| 2:15 p | See metal health note | Cynthia Lynd C |
| 4/10/07 | Nurse Note | |
| 9³⁰ a | Psych referral, Non- | |
| | Compliant c̄ AM Prozac — | S Scott LPN |
| 4/18/07 | Nurse Note | |
| 9:15a | Psych referral — No | |
| | Show for Prozac 20mg | |
| | q am since 4/3/07 — | M Moore LPN |

DOC 0084 (Eff. 9/300
(Replaces DC 714

Printed on Recycled Paper

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Western Illinois Correctional Center**

Offender Information:

| Stevenson | Michael | 1N935-69 |
|---|---|---|
| Last Name | First Name | MI    ID# |

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 4/22/07 | Nurse note | |
| 10:15AM | Non-compliant with Prozac | |
| | Psych referral made | 8 Zert LPN |
| 4-23-07 | Psych Note | ® Reschedule |
| 1:00 O | Cancelled due to time | in 23 days |
| N | Constraints | |
| 4-25-07 | Psych Note | |
| 3:10 O | Sa mental health note | |
| 5/1/07 | Nurse note | |
| 9:00 A | Here to see DR. Khan per tele- | |
| | psych | |

Distribution: Offender's Medical Record

Printed on Recycled Paper

DOC-0084 (Eff. 9/2002)
(Replaces DC 7147)

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Western Illinois Correctional** Center

Offender Information:

Last Name: Stevenson    First Name: Michael    MI: ___    ID#: N93569

| Date/Time | Subjective, Objective, Assessment | Plans |
|-----------|-----------------------------------|-------|
| 5/1/07 | Psych MD | |
| | (S) Pt seen for f/u was released. He is | |
| | [arrested]. Available medical records are reviewed | |
| | He states he is still depressed, while | |
| | he did not take his med almost for | |
| | one month. States sleep is not good | |
| | appetite good, d — SI/HI/AH | |
| | VH/delusion. | |
| | O: AAOx3, mood depressed, affect | |
| | constricted, Ø SI/HI/AH veil del— | |
| | noted, I/J partial | |
| | A/P: Depression NOS, PSA-Heroin, Coc, Etc | |
| | Change to Prozac 20 mg q HS. Encourage | |
| | him to take his med on regular | |
| | basis.    RTC in 2 months | |
| | | [signature] |

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

Western Illinois Correctional Center

Offender Information:

Last Name: Stevenson    First Name: Michael    MI:    ID#: N9356

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 7/3/07 8³⁰p | Nurse Note<br>I/m c/o psoriasis on face. States took triamcinolone in past et it worked at controlling the areas but never went completely away.<br>BP-124/72, P-68, R-20, T-98 Wt-250<br>Small patch psoriasis between eyes et one area on lt jaw. No open areas, some flaking noted<br>A) psoriasis _____ T Morris | $2.00 co pay signed<br>Keep skin clean et dry<br>DSC to eval.<br>7/16/07<br>Return to DSC pm |
| 7/6/07 8³⁰p | Nurse Note<br>Refusal signed pm N81 ——— T Morris | |

Printed on Recycled Paper

DOC 0084 (Eff. 8/2000)
(Replaces DC 7147)

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

Western Illinois Correctional Center

| Offender Information: | | |
|---|---|---|
| _Stevenson_ | _Michael_ | ___ |
| Last Name | First Name | MI |

ID#: N 93569

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 7/14/07 8:20 Am | MD SICK CALL  WT 257  BP 128/84  T 96.7  P 72  R 18   S  rashes on face for 1 year  ⊙  rashes on face cong. Brown color  rashes  Itchy ++  No discharge  No infected  Bruise on axilla had flish  Ⓐ - Skin rash (allergy)  Bruise on under arm | P   Aristocort 1%  apply Bid  X 2 Weeks  Triple Antibo  App ofor Bid  X 1 week     SM Davis M.D. |

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

EXHIBIT

0

| **Illinois** Department of **Corrections** | **ADMINISTRATIVE DIRECTIVE** | Number | 04.03.102 |
|---|---|---|---|
| | | Page | 1 of 6 |
| | | Effective | 9/1/2002 |

| Section | | **04** | **Programs and Services** |
|---|---|---|---|
| Subsection | **03** | **Medical and Health Care** | |
| Subject | | **102** | **Dental Care for Offenders** |

I.    **POLICY**

    A.    **Authority**

        730 ILCS 5/3-2-2, 5/3-7-2, 5/3-8-2, and 5/3-10-2

        Department Rule 415

    B.    **Policy Statement**

        The Department shall have each offender examined by a dentist upon admission to a reception and classification center or a facility designated by the Director to accept offenders with disabilities for a reception and classification center and shall provide each offender with clinically indicated treatment throughout the term of his or her incarceration.

II.    **PROCEDURE**

    A.    **Purpose**

        The purpose of this directive is to establish a uniform written procedure for the provision of dental services to offenders.

    B.    **Applicability**

        This directive is applicable to all adult Level One through Level Seven and juvenile Level One through Level Four correctional facilities within the Department.

    C.    **Internal Audits**

        An internal audit of this directive shall be conducted at least semi-annually.

    D.    **Designees**

        Individuals specified in this directive may delegate stated responsibilities to another person or persons unless otherwise directed.

    E.    **General Provisions**

        All dental documentation shall be filed in the dental section of the offender's Medical Record.

**EXHIBIT 2**

**Illinois** Department of **Corrections**

| **ADMINISTRATIVE DIRECTIVE** | Effective 9/1/2002 | Page 2 of 6 | Number 04.03.102 |
|---|---|---|---|

F.     **Requirements**

The Chief Administrative Officer shall ensure that dental examinations of offenders are conducted in accordance with the provisions of this directive.

1.     **Direction**

The dental services program shall be directed by an Illinois licensed dentist whose responsibilities are detailed in a written agreement, contract, or job description.

2.     **Initial Examination**

Within ten working days after admission to a reception and classification center or to a facility designated by the Director to accept offenders with disabilities for a reception and classification center, each offender shall receive a complete dental examination by a dentist.  The examination shall include the following and be documented on the offender's Dental Record, DC 7126:

a.     Charting of the oral cavity and categorization of status or treatment needs in accordance with the American Public Health Association's priorities delineated in Attachment A.

b.     For the adult facilities only, a full-mouth dental panorex x-ray that shall remain in the medical record.  The panorex x-ray shall be reviewed by the dentist at the reception and classification center or, if time does not permit, at the final destination.

3.     **Routine Examinations**

a.     Dentists shall conduct routine dental examinations every two years, regardless of age.  The examinations shall be documented on the DC 7126.

b.     Routine examinations shall be scheduled for completion by the end of the offender's birth month which is **at least** two years from the last dental examination conducted by the Department.  First time implementation of this scheduling procedure may result in exceeding the required frequency by less than a year.

**EXAMPLE:**  Offender Jones was born in June and his last dental examination was conducted in August 2001.  His next dental exam must be completed by June 2004.  The examination is **not** due in June 2003 because less than two years would have elapsed since the last dental examination.

c.     When an examination is conducted in conjunction with ongoing, dental therapy at some point prior to the biennial examination deadline, the biennial examination shall be identified and documented.

4.     **Offender Refusals**

*Illinois* Department of **Corrections**

| **ADMINISTRATIVE DIRECTIVE** | Effective 9/1/2002 | Page 3 of 6 | Number 04.03.102 |
|---|---|---|---|

An offender's refusal of any examination or any component of the examination shall be documented and included in the Dental Record.

a. An offender's refusal to be examined shall be documented on the Medical Services Refusal, DOC 0083, or on a copy of an approved call pass and placed in the medical record. If the offender refuses to sign the documentation, a witness shall sign and date the documentation indicating the offender refuses to be examined and to sign the refusal form.

b. If during an examination the offender refuses any component of the examination, the person conducting the examination shall document any such refusals in the Service Rendered area of the DC 7126.

5. **Dental Requests**

a. Where an offender requests a specific routine or non-emergency service, the offender may be scheduled for an appointment without a dental examination. The service shall be scheduled, but need not be performed, within 14 days of such request.

b. An offender requesting other dental care shall be examined by dental personnel within 14 days of such request, unless the offender is already scheduled for treatment or service regarding the same complaint or service.

6. **Dental Prosthetics**

a. Removable dental prosthetics shall be provided on a case by case basis as determined clinically necessary by the dentist.

(1) If an anterior tooth is extracted during incarceration or prosthetics that were made before incarceration become nonfunctional, appropriate dental prosthetic devices shall be provided.

(2) If a posterior tooth is extracted during incarceration, a prosthetic device may be fabricated but is not mandated unless three or more of the missing teeth are required for mastication.

b. Offenders who have lost or broken a dental prosthetic through negligence shall be required to pay the dental laboratory fee for replacement. The offender shall be required to sign a Request for Payment, DC 828, authorizing the deduction of the payment from present or future funds in his or her trust fund account. The time frame for replacement shall be according to priority and availability as determined by the dentist.

**Illinois** Department of **Corrections**

| ADMINISTRATIVE DIRECTIVE | Effective 9/1/2002 | Page 4 of 6 | Number 04.03.102 |
|---|---|---|---|

7. **Dental Emergencies**

Any offender in a correctional facility experiencing a dental emergency as defined by the staff dentist shall receive a dental examination no later than the next working day after the emergency occurs.

8. **Specialized Dental Services**

   a. Consultation and referral capability to recognized specialties of dentistry such as oral surgery shall be available and utilized as clinically indicated and subject to utilization review.

   b. Services or procedures such as endodontics, periodontics, or the continuation of orthodontic care initiated prior to incarceration may be available as determined clinically necessary by the facility dentist or Dental Director, if applicable. Factors to be considered in making the determination to approve such procedures or services shall include, but not be limited to, the priority of dental need and the availability of staff, time, and equipment. Any dispute regarding the level of service shall be resolved between the facility dentist and the Agency Medical Director.

9. **On-Site Dental Services**

Where dental services are provided on site, dental hours available to the offender population shall be provided in the following approximate minimum weekly ratios.

   a. Adult and juvenile Level One Facilities - 1 hour on-site dental coverage for each 40 offenders.

   b. Adult Level Two through Five and juvenile Level Two and Three Facilities - 1 hour on-site dental coverage for each 50 offenders.

   c. Adult Level Six and Seven and juvenile Level Four Facilities - 1 hour on-site dental coverage for each 60 offenders.

10. **Completion of Necessary Dental Treatment**

All major dental treatment that in the evaluation of the dentist has the potential to require acute priority dental intervention shall be completed prior to transfer to an adult Level Eight or juvenile Level Five facility, unless treatment is waived in writing by the offender for the following conditions.

   a. Missing upper or lower anterior teeth.

   b. Non-painful cavities, localized gingival involvement, or Class II, III, or IV fractured anterior teeth (see attachment A).

*Illinois* Department of **Corrections**

| ADMINISTRATIVE DIRECTIVE | Effective 9/1/2002 | Page 5 of 6 | Number 04.03.102 |
|---|---|---|---|

    c.      All conditions in Categories IV, V, and VI (see attachment A).

11.    **Dental Diets**

Upon a direct order from the dentist, the facility shall offer special or mechanically soft diets to offenders undergoing prolonged dental procedures. The dentist shall review and re-order these diets at least every 14 days.

12.    **Co-Payment for Non-emergency Dental Services in Adult Facilities**

    a.      Offenders in adult facilities who request non-emergency treatment shall pay the Department a $2.00 co-pay per visit. Non-emergency services are services requested by the offender and determined non-emergent by a Department dentist.

    b.      At the time of the non-emergency evaluation, the offender shall be required to sign a Request for Payment, DC 828, authorizing the deduction of the co-pay from present or future funds in his or her trust fund account. Justification for co-pay shall be documented on the dental record.

    c.      When the evaluation is conducted, the Health Care Unit shall submit the DC 828 to the business office for processing in accordance with Administrative Directive 02.42.105.

Authorized by:

Donald N. Snyder Jr.
Director

Supersedes:
04.03.102A-J          AD          1/1/1995
And as amended 3/1/1995 and 5/1/1997

*Illinois* Department of **Corrections**

| **ADMINISTRATIVE DIRECTIVE** | Effective 9/1/2002 | Page 6 of 6 | Number 04.03.102 |
|---|---|---|---|

## ATTACHMENT A
### American Public Health Association
### Based Categorization of Dental Patients (APHA)

Dentist and dental hygienists shall use the following APHA based categorization of dental patients as a guide to providing dental care and for the establishment of priorities to identify and treat oral conditions.

1. **Category I - Emergency Treatment**

   a. Bleeding and pain.

   b. Acute periapical abscess.

   c. Acute periodontitis.

   d. Vincents infection.

   e. Acute gingivitis.

   f. Acute stomatitis.

   g. Fracture of teeth (also see 3.c.).

   h. Fracture of jaw or jaws.

   i. Gaping wounds of lips and cheeks.

2. **Category II**

   a. An oral condition, if left untreated, that would cause bleeding or pain in the immediate future.

   b. An oral infection of an oral condition which, if left untreated, would become acutely infected.

   c. An oral condition such as edentulousness or missing upper or lower anterior teeth which presents a physical problem with mastication or a psychosocial problem with the offender's sense of well being, confidence, and adjustment.

   d. An undiagnosed or suspected oral condition such as ulcerative lesion or growth of tissue.

3. **Category III**

   a. The presence of medium to large non-painful carious lesions.

   b. A localized gingival involvement.

   c. Class II, Class III, or Class IV fracture anterior tooth or teeth.

   d. The presence of temporary, sedative, or intermediate restorations which have deteriorated extensively.

   e. Broken or ill fitting prosthetic appliance.

4. **Category IV**

   a. Small carious lesions which radiographically present no imminent danger to the pulp.

   b. The need for dental restorative procedures with significant laboratory costs involved, such as cast partial dentures.

   c. Severe non-functional bite and malocclusion which involves psychosocial factors in the offender's appearance and his or her potential for adjustment (not involving orthodontic treatment).

5. **Category V**

   a. Radiographical absence of carious lesions.

   b. Lack of clinically visible gingival irritation.

6. **Category VI**

   No symptoms or apparent need for dental treatment related to the type of assessment or inspection performed.

E-FILED
Tuesday, 15 April, 2008  12:39:07 PM
Clerk, U.S. District Court, ILCD

0545-R4M8
Tmo IDmW

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

MICHAEL STEVENSON, Inmate    )
#N93569,                     )
                             )
              Plaintiff,     )
                             )
          -vs-               )   No. 07-3108
                             )
DR. SCHOLZ, et al.,          )
                             )
              Defendant.     )

COPY

**THE DEPOSITION OF MICHAEL STEVENSON, #N93569,**

taken before Amy S. Powers, Illinois CSR

084-003053, RPR 038540, a Notary Public, on

Tuesday, the **29th** day of **January 2008**, commencing

at the hour of 10:00 a.m., at Illinois River

Correctional Center, Route 9 West, in the City of

Canton, County of Fulton, and State of Illinois.

**CIRCUIT WIDE REPORTING**
Suite 316 Hill Arcade Building
Galesburg, Illinois 61401
(309) 343-3376 * 1-800-342-DEPO

**PRESENT:**

MICHAEL STEVENSON, #N93569
Illinois River Correctional Center
Route 9 West
Canton, Illinois 61520
     appearing Pro Se;

THERESA POWELL, ESQ.,
Heyl, Royster, Voelker & Allen
1 North Old State Capitol Plaza
P.O. Box 1687
Springfield, Illinois 62705-1687
     on behalf of Dr. Scholz;

ELLEN C. BRUCE, ESQ.,
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
     on behalf of Melody Ford, Deborah
     Fuqua, Tara Goins, Steven Vanstrien,
     Roger E. Walker, Jr., and Roger
     Zimmerman.

## I N D E X

| WITNESS | PAGE |
|---|---|
| MICHAEL STEVENSON, #N93569, | |
| Examination by Ms. Bruce | 3 - 24 |
| Examination by Ms. Powell | 25 - 48 |
| Further Examination by Ms. Bruce | 48 - 51 |
| Certificate of Reporter | 53 - 54 |
| Signature Page | 55 |

EXHIBITS
  No Exhibits

```
 1    (Witness sworn.)
 2              MICHAEL STEVENSON, #N93569,
 3    having been first duly sworn, was examined and
 4    testified on his oath as follows:
 5
 6    DIRECT EXAMINATION BY MS. POWELL:
 7    Q.   Would you state your name, please.
 8    A.   Michael Stevenson.
 9    Q.   And you are currently incarcerated at the
10         Illinois River Correctional Center?
11    A.   Yes, ma'am.
12    Q.   How long have you been here at Illinois
13         River?
14    A.   About three weeks.
15    Q.   Okay.  Before that were you at the Western
16         Illinois Correctional Center?
17    A.   Yes.
18    Q.   And when were you first incarcerated at
19         Western?
20    A.   May '05 or June '05.
21    Q.   And before that were you at another
22         correctional facility, or is that the first
23         place?
24    A.   Cook County Jail.
```

1    Q.    Okay.  And how long were you at the Cook
2          County Jail?
3    A.    Eleven months.
4    Q.    Okay.  And before that where did you live?
5    A.    In Chicago.
6    Q.    Okay.  And are you on any medications that
7          would affect your ability to understand my
8          questions or to answer them?
9    A.    No.
10   Q.    And do you have a dentist in Chicago that
11         you regularly saw?
12   A.    No.
13   Q.    When's the last time you had seen a dentist
14         before you were incarcerated?
15   A.    Before incarceration?  Would that also be
16         Cook County Jail or before that?
17   Q.    Before that.
18   A.    When was the last time I seen a dentist?
19         It's been awhile.
20   Q.    You can't remember?
21   A.    No.
22   Q.    Okay.  And do you remember the name of the
23         dentist -- well, did you see a dentist while
24         you were in the Cook County Jail?

```
 1   A.   Yes.

 2   Q.   Do you remember the name of that dentist?

 3   A.   No, I do not.

 4   Q.   All right.  I'm here to ask you questions

 5        today about your claim against Dr. Scholz,

 6        the dentist at Western Illinois Correctional

 7        Center.  And what are you saying that

 8        Dr. Scholz did wrong?

 9   A.   He didn't provide me medical care.

10   Q.   Okay.  What medical care are you saying he

11        didn't provide you?

12   A.   Whatever treats gingivitis and the pain that

13        I was having associated with gingivitis.

14   Q.   When was the first time that you were

15        diagnosed with gingivitis?

16   A.   7-05-06.

17   Q.   And was that the first time that you saw

18        Dr. Scholz?

19   A.   Yes.

20   Q.   And before 7-05-06 had you seen any other

21        dentists at Western Illinois Correctional

22        Center?

23   A.   No.

24   Q.   And maybe -- had you been at Western for a
```

|    |    |                                             |
|----|----|---------------------------------------------|
| 1  |    | year before you saw any dentist, or was it  |
| 2  |    | just a few months?                          |
| 3  | A. | It was a few months.                        |
| 4  | Q. | Okay.  Because earlier you told me you went |
| 5  |    | to Western in May of '05.                   |
| 6  | A. | Oh, I'm sorry, yes, it was '06 then, I'm    |
| 7  |    | sorry.                                      |
| 8  | Q. | That's okay.  And then did you put in for -- |
| 9  |    | see, your Motion for Summary Judgment says  |
| 10 |    | you put in an emergency request to be seen  |
| 11 |    | by a dentist; is that correct?              |
| 12 | A. | Yes.                                        |
| 13 | Q. | And then you were seen by Dr. Scholz on July |
| 14 |    | the 5th of '06, right?                      |
| 15 | A. | Correct.                                    |
| 16 | Q. | Is it your understanding that he's the one  |
| 17 |    | that actually diagnosed the gingivitis?     |
| 18 | A. | Yes.                                        |
| 19 | Q. | And do you understand how -- or what        |
| 20 |    | gingivitis is?                              |
| 21 | A. | Yes.                                        |
| 22 | Q. | What is your understanding of what          |
| 23 |    | gingivitis is?                              |
| 24 | A. | Gingivitis is a periodontal gum disease.    |

1   Q.   Do you know the difference between

2        gingivitis and periodontal disease?

3   A.   No, I'm not a doctor.

4   Q.   Okay.

5   A.   But I just understand that it's a

6        periodontal gum disease.

7   Q.   Well, what's your understanding of what

8        periodontal means?

9   A.   I haven't the slightest idea.  I guess it

10       pertains to the mouth, teeth, gums.

11  Q.   And do you have an understanding as to how

12       long you had gingivitis?

13  A.   No.

14  Q.   And can you tell me what your dental hygiene

15       has been for the last five years before you

16       became incarcerated?

17  A.   Brush my teeth about once a day.

18  Q.   Have you ever had any fillings in your teeth

19       before you came to prison?

20  A.   One.

21  Q.   And when was that?

22  A.   I'm not sure, but somewhere in the mid '90s.

23  Q.   Okay.

24  A.   Maybe '97, '98, maybe at the end.

1    Q.    Okay.  Had you ever had your teeth

2          professionally cleaned by a dentist?

3    A.    Yes.

4    Q.    When was that?

5    A.    Probably around 2000 and 2005.

6    Q.    Was that two separate occasions?

7    A.    Yes.

8    Q.    So in 2000 you had your teeth cleaned and in

9          2005 you had your teeth cleaned?

10   A.    Yes.

11   Q.    Did you have problems with your teeth on

12         those occasions?

13   A.    No.

14   Q.    Do you remember the dentist who cleaned your

15         teeth?

16   A.    No.

17   Q.    And that was in Chicago?

18   A.    The one in 2000 was actually down here at

19         Illinois River.  And 2005 was in Cook County

20         Jail.

21   Q.    Have you ever had your teeth cleaned when

22         you were not in the prison or in a jail?

23   A.    No.

24   Q.    Would any dentist have x-rays of your teeth

```
 1          outside of the prison system?
 2   A.     Yes.
 3   Q.     Who was that?
 4   A.     Dr. Cross.
 5   Q.     And who is that?  Is he a dentist somewhere?
 6   A.     Yes.  His office used to be on 75th Street,
 7          somewhere around 2200 East 75th Street.
 8          Around 75th and Clyde.
 9   Q.     And when would you have seen him?
10   A.     All through my childhood.  All the way up to
11          about 14.
12   Q.     And how old are you now?
13   A.     I'm 37.
14   Q.     Okay.  So you're saying that Dr. Scholz
15          diagnosed you with gingivitis in July of
16          2006, right?
17   A.     Yes.
18   Q.     And you saw Dr. Scholz on a couple other
19          occasions?
20   A.     Yes.
21   Q.     In 2006, right?
22   A.     Yes.
23   Q.     And you're claiming that you wanted
24          treatment, some sort of treatment for your
```

```
 1         gingivitis, right?
 2    A.   Yes.  I didn't know at that time exactly
 3         what the treatment were -- was, but I
 4         assumed that he would give me some type of
 5         medication.
 6    Q.   For what?
 7    A.   For the bleeding, the swolled (sic) gums.  I
 8         didn't know that it was something that he
 9         would have to go do.  I thought it was some
10         type of pill, some time of medication or
11         something that I would gargle with.  At that
12         time that's what I believed.
13    Q.   Okay.
14    A.   But then I found out that in my stage of
15         gingivitis that he should have root planed
16         or scaled to alleviate the problem.
17    Q.   And at the time that you saw Dr. Scholz,
18         what did he tell you?
19    A.   He told me that it was more severe problems
20         at Western Illinois than to deal with my --
21         my gingivitis.  He said there was people
22         with teeth that needed to be pulled.
23    Q.   And you don't know what those problems were?
24    A.   Other people's problems?
```

```
 1   Q.   Right.

 2   A.   No, he just said it was more severe problems

 3        than mine.

 4   Q.   Okay.  And then what happened, anything?

 5        Did you see Dr. Scholz again?

 6   A.   I think I seen him a total of three or four

 7        times before he decided to do anything.

 8   Q.   Okay.  And it's my understanding from

 9        looking at your records that you have

10        actually had your teeth scaled, right?

11   A.   Yes.

12   Q.   Okay.

13   A.   By Dr. Scholz.

14   Q.   So what injuries are you saying you

15        sustained as a result of anything Dr. Scholz

16        did or didn't do?

17   A.   Well, as far as I know, some of the things

18        remains to be -- remains to be seen.  But at

19        that time, you know, my gums were swolled

20        (sic), I couldn't eat.  I was just dealing

21        with a lot of pain, you know.  I couldn't

22        eat, I was -- the temperatures and heating

23        and things like that that went to my mouth,

24        all the things bothered me.
```

```
 1   Q.   Okay.  You understand that your gums were
 2        swollen because of the gingivitis, right?
 3   A.   Yes.
 4   Q.   And were you flossing your teeth?
 5   A.   Yes.
 6   Q.   When did you start flossing your teeth?
 7   A.   When Dr. Scholz told me on 7-05-06.
 8   Q.   And before 7-05-06 had you ever started
 9        flossing your teeth?
10   A.   Well, I was flossing, but not on a regular
11        basis.
12   Q.   And are you flossing on a regular basis now?
13   A.   Yes.
14   Q.   And did Dr. Scholz explain to you that
15        gingivitis is caused by a build-up of plaque
16        on your teeth?
17   A.   Yes.
18   Q.   And poor dental hygiene?
19   A.   Yes.
20   Q.   So your gums were swollen, your gums were
21        bleeding, what else?
22   A.   They bled, my teeth began to loosen.
23   Q.   Did you lose any teeth?
24   A.   No.
```

1    Q.    Did you lose any weight?

2    A.    Yes.

3    Q.    How much?

4    A.    I could tell you though.  I think it was

5          somewhere about 20-something pounds.  I

6          think about 20-something pounds.

7    Q.    Were you on a diet during that time?

8    A.    No.  It was just like I couldn't eat a lot

9          of things.  The fish, chicken, bread,

10         cookies, chips, the noodles that you sold in

11         commissary was too spicy.  I couldn't eat

12         any of that stuff.  I tried to eat plain

13         noodles, any mushy vegetable.  I couldn't

14         eat corn.  A lot of the things affected me

15         and I just -- the pain was just -- was just

16         too great for me to deal with, so there's a

17         lot of things I couldn't eat.

18   Q.    So did you not go to the chow?

19   A.    Yeah, I went all the time.

20   Q.    All right.

21   A.    And ate what I could.

22   Q.    So you ate, but you just didn't eat as much?

23   A.    Yeah.  It was too painful.

24   Q.    And how long did that last?

1    A.    About a year.

2    Q.    Do you have any current problems?

3    A.    No.  Not that -- not associated with my

4          teeth.

5    Q.    Okay.  And other than what you've described,

6          did you have any other problems that you

7          associated with your teeth?

8    A.    At that time?

9    Q.    Right.

10   A.    No.  If it was, it was mask whatever pains I

11         was having.  Like I say, I'm not a dentist.

12         I just reported my symptoms to Dr. Scholz

13         and it just progressed.  It got worse and

14         worse.  I do have some type of problems now,

15         but I don't know if it's associated with the

16         gingivitis or not.  I'm waiting to see the

17         dentist down here.

18   Q.    And now that you're at Illinois River, you

19         don't see Dr. Scholz anymore, correct?

20   A.    No.

21   Q.    That's correct?

22   A.    Yes, that's correct.

23   Q.    And do you remember when the last time was

24         that you saw Dr. Scholz?

1   A.   No.  It had to -- it was sometime after

2        8-07.

3   Q.   Okay.  And how many times did Dr. Scholz do

4        the scaling?

5   A.   Once.

6   Q.   Okay.  And the root planing, that was all

7        done together, right?

8   A.   Yes.

9   Q.   And were they -- did you ever have your

10       teeth cleaned at the Cook County Jail?

11  A.   Yes.

12  Q.   How many times?

13  A.   Once.

14  Q.   And did they do anything else?

15  A.   No.

16  Q.   Did they take any x-rays of your teeth?

17  A.   No, not that I can remember.

18  Q.   And do you have copies of any of your dental

19       records from the Cook County Jail?

20  A.   No.

21  Q.   Did you have any conversations with your

22       dentist there about your teeth?

23  A.   At Cook County Jail?

24  Q.   Right.

E-FILED
Tuesday, 15 April, 2008  12:39:53 PM
Clerk, U.S. District Court, ILCD

| | | |
|---|---|---|
| 1 | A. | Regular conversation. |
| 2 | Q. | About your teeth with the dentist? |
| 3 | A. | She gave me oral health instructions after |
| 4 | | she cleaned my teeth and told me to brush, |
| 5 | | things like that, basic things. |
| 6 | Q. | Okay.  And in your Motion for Summary |
| 7 | | Judgment, you indicate that you put in for |
| 8 | | an emergency visit with the dentist when you |
| 9 | | arrived at Western.  What was the problem |
| 10 | | that you had when you got to Western? |
| 11 | A. | My teeth was beginning to -- my gums was |
| 12 | | beginning to swell up and bleed. |
| 13 | Q. | And how long had that been going on? |
| 14 | A. | I don't know. |
| 15 | Q. | Well, was it -- |
| 16 | A. | It seemed like it -- probably about a month. |
| 17 | Q. | And had you reported any of those problems |
| 18 | | at the Cook County Jail? |
| 19 | A. | No, I didn't have that problem at Cook |
| 20 | | County Jail. |
| 21 | Q. | So the problem -- the problems that you |
| 22 | | described you developed while you were at |
| 23 | | Western? |
| 24 | A. | No, I started recognizing them when I was in |

1          NRC.

2     Q.   Is that Stateville?

3     A.   Yeah, intake.

4     Q.   Okay.  Well, when did you go to Stateville?

5     A.   I don't know.

6     Q.   Did you report any problems to the dentist

7          at Stateville?

8     A.   I think -- I don't know.  I'm not sure if I

9          did or not.  It's a brisk process.  You

10         know, each department try to get you in and

11         out as quick as possible.  They just do --

12         as far as I know, they just -- they just

13         do -- I don't know, some type of primary

14         screening just to -- just an intake process.

15    Q.   Okay.  So if you --

16    A.   They don't really care about problems I

17         don't think.

18    Q.   So you don't recall any conversations you

19         had with any problems regarding complaints

20         about your teeth?

21    A.   No.  I just remember them doing x-rays.

22         That's about all I can remember that the

23         dentist did down there.

24    Q.   Okay.  The dentist where?

```
 1    A.    NRC.

 2    Q.    Oh, they did take x-rays of your teeth?

 3    A.    Yes.

 4    Q.    Okay.

 5    A.    Upon intake, that's what they do.

 6    Q.    And did they say anything to you about any

 7          problems they recognized with your teeth?

 8    A.    No.  They just -- they just noticed -- noted

 9          the teeth that I had missing.

10    Q.    Okay.  Have you had some teeth pulled?

11    A.    Yes.

12    Q.    And what was the problem?  Why did you have

13          to have your teeth pulled?

14    A.    One was cracking, one of the front -- I

15          don't know if they call them cisors (sic).

16    Q.    The incisors?

17    A.    Incisors.

18    Q.    Okay.

19    A.    One of them was cracked, so it was pulled.

20          My wisdom tooth, it was pulled because it

21          grew the wrong direction.

22    Q.    And that's the only teeth you've had taken

23          out?

24    A.    Yes.
```

```
 1    Q.    Okay.  And was that all done while you were

 2          incarcerated?

 3    A.    The canine -- I mean, the wisdom tooth.

 4    Q.    Okay.

 5    A.    It was done in, I don't know, '97, '98 down

 6          at Illinois River.

 7    Q.    Okay.  And the other tooth?

 8    A.    It was done maybe '84, '83, '85, somewhere

 9          up in there.

10    Q.    Were you in school?  Were you still living

11          with your mom then?

12    A.    Yeah.

13    Q.    Do you know who did that?

14    A.    I pulled it out.  I pulled out it.

15    Q.    Oh, you pulled it out yourself.  Okay.  And

16          do you know how it got cracked?

17    A.    Yeah, I fell on my face.

18    Q.    Have you ever had any other problems with

19          your teeth?

20    A.    No, except for the cavity, the one cavity

21          that I have.

22    Q.    Do you have it now?

23    A.    The cavity?

24    Q.    Yes.
```

```
 1    A.   Yes, it's filled.

 2    Q.   Who filled that?

 3    A.   Dr. Downey, Illinois River.

 4    Q.   Are your gums swollen at this present time?

 5    A.   No.

 6    Q.   Do you have the bleeding anymore?

 7    A.   No.

 8    Q.   And did you gain the weight back?

 9    A.   No.

10    Q.   Did you want to?

11    A.   No.

12    Q.   You look better now, you feel better now

13         that you've lost some weight?

14    A.   Yeah.

15    Q.   That's a yes?

16    A.   Yes.

17    Q.   Okay.  Were you on an exercise program at

18         the time that you lost the weight?

19    A.   No.

20    Q.   Do you have any other -- do you have any

21         medical conditions like diabetes or anything

22         like that?

23    A.   No.  The only problem that I really could

24         see, you know, with my gums right now, that
```

```
 1        they -- they recess past the enamel line,

 2        and I'm still sensitive to cold and warm

 3        foods.

 4   Q.   Did you have a conversation with any dentist

 5        about that?

 6   A.   No, I'm waiting to see the dentist down here

 7        now.

 8   Q.   And are all your teeth sensitive, or just

 9        the one where you had the filling?

10   A.   No, the one on this side (indicating).  Some

11        type of black is growing in there, so I

12        don't know what it is.  I'm waiting to see

13        this dentist.

14   Q.   Is it just one tooth that has the

15        sensitivity?

16   A.   Yeah, pre-molars.

17   Q.   Is that tooth by any other -- by any of the

18        teeth that you had worked on?

19   A.   I don't understand.

20   Q.   Is the tooth that's sensitive, is it near

21        any of the teeth that you had worked on in

22        the past?

23   A.   Dr. Scholz worked on all of them.

24   Q.   Okay.  Well, is this tooth by any -- by the
```

```
 1          tooth that has the filling?
 2    A.    No.  On the other side.
 3    Q.    Did you see a doctor about your complaints
 4          of a headache?
 5    A.    Yes, I did.
 6    Q.    And which doctor did you see?
 7    A.    Dr. Brown, the medical director from Wexford
 8          Medical, on-site medical director or
 9          something like that.
10    Q.    Did he treat you for your headaches?
11    A.    I can't recall if he -- if he gave me any
12          aspirin.  It seems to me like I remember
13          getting some aspirin, or they told me to go
14          to commissary or something.  He told me --
15          he looked at my teeth and said he was going
16          to speak to Dr. Scholz.
17    Q.    Okay.  And did he say that your headaches
18          were related to your teeth?
19    A.    No, he didn't say that.
20    Q.    Did any doctor ever say that your headaches
21          were related to your teeth?
22    A.    No.
23    Q.    And did any physician or dentist ever
24          indicate to you that your gingivitis was an
```

1       emergent condition?

2   A.  Dr. Brown -- Dr. Brown might have, because

3       he said he was going to, you know, after he

4       looked at my teeth when Dr. Scholz wouldn't

5       see me anymore, because he kept telling me

6       it's nothing I can do, and he wouldn't

7       answer my request slips anymore, so I went

8       to see the regular doctor, Dr. Brown.  And

9       when he seen my teeth and had it was

10      bleeding and swolled (sic) up, he said he

11      was going to talk to Dr. Scholz about it.

12      So I don't know if that was -- if he

13      considered that an emergency at that time or

14      what, but he said he was going to speak to

15      him.  Unfortunately, Dr. Scholz wasn't there

16      that day and he -- Dr. Brown called me back

17      concerning my teeth and just said that he

18      was going to talk to him.  So I don't know.

19  Q.  Okay.  Did Dr. Brown send you out to the

20      hospital on any of the dates that he saw you

21      and looked at your teeth?

22  A.  No.

23  Q.  Okay.  And the conversation that you had

24      with Dr. Brown, was that before you had the

1          scaling done by Dr. Scholz?

2     A.    Yes.

3     Q.    Okay.  And how many times do you think you

4           saw Dr. Brown for your problems?

5     A.    Well, concerning this tooth?

6     Q.    Right.

7     A.    My teeth?  Twice.

8               MS. POWELL:  All right.  I don't think

9           I have any other questions.  Thanks.

10              THE WITNESS:  Can I have a copy of the

11          transcript?

12              MS. BRUCE:  I have some questions.  I

13          represent the other defendants.  I'm Ellen

14          Bruce.

15              MS. POWELL:  Then we'll talk to you at

16          the end.

17              THE WITNESS:  Oh, so you are --

18              MS. POWELL:  I just represent

19          Dr. Scholz.

20              THE WITNESS:  And your name?

21              MS. POWELL:  Theresa Powell.  And she

22          represents all the other people.

23              MS. BRUCE:  I represent Roger Walker,

24          Steven Vanstrien, Melody Ford, Deborah

1          Fuqua, Tara Goins.

2

3    **DIRECT EXAMINATION BY MS. BRUCE:**

4    Q.    Why are you suing Roger Walker?

5    A.    Well, he could have done something about it.

6          He's a director.

7    Q.    Did you ever speak with Director Walker?

8    A.    No.  Not personally.

9    Q.    Did you -- how did you contact Mr. Walker?

10   A.    Through the grievance system, yes.

11   Q.    And did he respond to your grievances?

12   A.    I would say yes.

13   Q.    Would you recognize Roger Walker's

14         signatures?

15   A.    No, but I have it.  I have.  .  .

16   Q.    So is that the only reason why you're suing

17         him?

18   A.    Yes, because he -- I believe that he could

19         have done something to prevent this from

20         going this far, seeing as he is the

21         director.

22   Q.    Did you ever meet him face-to-face?

23   A.    No.

24   Q.    So he was never present at any of your

```
 1        dental visits that you had?
 2   A.   No.
 3   Q.   Or your doctor visits?
 4   A.   No.
 5   Q.   Do you know if he's a dentist, Director
 6        Walker?
 7   A.   No.  I'm quite sure he isn't.
 8   Q.   Why are you suing Roger Zimmerman?
 9   A.   He's the warden.  He could have done
10        something to prevent this from happening.
11   Q.   And what could he have done?
12   A.   I guess he could have seen -- made sure that
13        I have treatment for gingivitis for this
14        problem.
15   Q.   Did he know that you had gingivitis?
16   A.   I would say yes.
17   Q.   And how would he have known that you had
18        gingivitis?
19   A.   Through the grievance system.  I sent the
20        request slips.  And I spoke to him once on
21        the wing when he did a little, I guess,
22        called it a walk-by or whatever, and I spoke
23        to him.  And he told me when he seen my
24        teeth and gums, he said, yeah, you got a
```

```
 1        problem.  And he told me send a request
 2        slip.  I sent a request slip, never
 3        responded.
 4    Q.  Did he tell you to send -- well, first of
 5        all, when did you see him?
 6    A.  I don't know exactly when.  It was '06.
 7        Maybe it was somewhere around August.
 8    Q.  So you had been to the dentist at least once
 9        by that point?
10    A.  Yeah.
11    Q.  Who did he tell you to send the request slip
12        to?
13    A.  To him.
14    Q.  Does he schedule appointments in the
15        Healthcare Unit?
16    A.  Not that I know of.  But I'm quite sure that
17        he can do whatever he wants as the warden.
18    Q.  And did you send a request slip to
19        Mr. Zimmerman?
20    A.  Yes.
21    Q.  Okay.  What did you ask for in that request
22        slip?
23    A.  I reminded him that I was having problems
24        with my gingivitis and I wasn't being seen,
```

```
 1              I wasn't being treated for it.
 2      Q.      Do you have a copy of this request slip?
 3      A.      No.
 4      Q.      Did you get any response to your request
 5              slip that you had sent to Mr. Zimmerman?
 6      A.      No.  And I believe that's the reason why I
 7              started writing grievances.  I wrote an
 8              emergency grievance to him because I knew
 9              that would go directly to him.
10      Q.      And when did you write that grievance?
11      A.      It was either 9-10 -- it had to been 9-10 --
12              9-13-06.
13      Q.      And what was his response, or what was the
14              response with that grievance?
15      A.      It was -- he marked yes, expedite emergency
16              grievance.  Or was that 10?  I'm going to
17              find it right here for you.  Just a minute.
18      Q.      Do you remember what had happened with that
19              grievance?
20      A.      The normal procedure is that once he
21              expedited -- I mean once he mark it as an
22              emergency grievance, that it go direct to
23              the grievance officer.  And the grievance
24              officer -- that was 10-06-06.  When I wrote
```

```
 1          the emergency grievance to -- it was 9-10,

 2          the first one, the first one I gave you.

 3    Q.    So your first grievance that you had filed

 4          was an emergency grievance?

 5    A.    Yes.

 6    Q.    Okay.  And Director -- or, I'm sorry, Warden

 7          Zimmerman had signed off on it as an

 8          emergency grievance?

 9    A.    Yes.

10    Q.    And then what happened next?

11    A.    It went to Tara Goins.  And she did some

12          type of -- she spoke to someone and

13          recommended that the grievance be denied,

14          and he concurred with it based on what she

15          said.

16    Q.    Do you know who she spoke with, Ms. Goins?

17    A.    She spoke with Deborah Fuqua and Dr. Scholz.

18    Q.    Okay.  And who is Debbie Fuqua?

19    A.    She was the Healthcare Administrator for

20          Western Illinois.

21    Q.    And were you present for any of these

22          conversations that Ms. Goins had with either

23          the dentist or Ms. Fuqua?

24    A.    No.
```

```
 1    Q.   So all the information that you have is

 2         contained in her grievance response?

 3    A.   Yes.

 4    Q.   Did you contact Mr. Zimmerman any other way

 5         than when you had seen him on your

 6         gallery --

 7    A.   After that I didn't see him anymore.

 8    Q.   When you said that he had looked at your

 9         teeth?

10    A.   Yes.

11    Q.   Is he a dentist?

12    A.   No.

13    Q.   You're also suing Melody Ford.  Why are you

14         suing Melody Ford?

15    A.   She reviewed my grievance after it was

16         denied and she recommended that it be denied

17         also based --

18    Q.   Do you know what her title is?

19    A.   She's a board member.

20    Q.   Is she a member of the Administrative Review

21         Board?

22    A.   Yeah.

23    Q.   And did you ever see her face-to-face?

24    A.   No.
```

E-FILED
Tuesday, 15 April, 2008  12:40:23 PM
Clerk, U.S. District Court, ILCD

1   Q.   So the only contact you had with her was

2        through her response to your grievance?

3   A.   Yes.

4   Q.   She denied it.  So she never saw your teeth?

5   A.   No.

6   Q.   She never had any idea other than the

7        information provided to her in the grievance

8        process?

9   A.   Yes.

10  Q.   Did you ever contact her through any other

11       way other than through the grievance

12       process?

13  A.   No.

14  Q.   So she was never present at the prison at

15       any of your visits or any of your dental

16       exams that you had had?

17  A.   No.

18  Q.   And then with Deborah Fuqua, why are you

19       suing her?

20  A.   She also could have -- that's the first

21       person that my dental request went to.  And

22       I believe she forwarded it to Dr. Scholz.

23       Sometime after that I wrote her more request

24       slips, let her know that Dr. Scholz wasn't

```
 1        giving me any treatment.  And I think in one

 2        of the grievances she wrote that I was seen.

 3        She just basically said I was seen by the

 4        dentist and that cleaning was not performed

 5        at WICC.

 6   Q.   How do you know your request slips went to

 7        Defendant Fuqua?

 8   A.   That's who I addressed them to.

 9   Q.   Do you think anybody else might have opened

10        those requests?

11   A.   It's possible.

12   Q.   How did you file these requests?

13   A.   Through the request procedures that they

14        have down in Western.

15   Q.   So you didn't hand them directly to

16        Defendant Fuqua?

17   A.   No, no.

18   Q.   Did you ever meet with her face-to-face?

19   A.   No.

20   Q.   So was her only interaction then through the

21        grievance process?

22   A.   Grievance process and request slips.

23   Q.   Was she ever at -- present for any of your

24        dental treatment?
```

```
 1    A.    No, not that I know of.
 2    Q.    Was she ever present at any of your doctor's
 3          exams that you had in relation to your
 4          treatment?
 5    A.    Not that I know of, because I don't even
 6          know how she looks, so she could have been
 7          standing right next to me and I don't know.
 8    Q.    So you've never seen her?
 9    A.    No.
10    Q.    As far as you know?
11    A.    As far as I know.
12    Q.    Okay.  Why are you suing Tara Goins?
13    A.    Tara Goins, she's the grievance officer and
14          she could have, you know, she could have --
15          she could have done more than what she done.
16          She could have reviewed all the facts that I
17          gave to her.  She could have seen me
18          personally if she wanted to.  And she could
19          have recommended to Warden Zimmerman that I
20          be seen by a dentist or somebody by the
21          outside.  That was her job.  And she never
22          seen me.  She just took the information that
23          was inside of my reports, my grievance
24          reports, and went off of that.
```

```
 1    Q.    What facts did you provide her with?

 2    A.    As much as possible.  That my teeth was

 3          bleeding, that I seen the dentist, what his

 4          responses were, that I was in pain, that I

 5          couldn't eat, that I believe I also outlined

 6          to her that by me not receiving treatment,

 7          that this was some sort of cruel and unusual

 8          punishment.

 9    Q.    Was all this information in your grievance,

10          or did you provide her with additional

11          information?

12    A.    It was in my grievance.

13    Q.    And how do you know that she didn't take

14          that into account when she responded to your

15          grievance?  Just because she decided that

16          you didn't -- that she denied your

17          grievance?  Is that what you.  .  .

18    A.    Well, I figured if she read the grievance,

19          then she would have took all them things

20          into account.  And, I mean, her response was

21          based upon a review of all total available

22          information.  She recommended that the

23          grievance be denied.  So I'm assuming off of

24          what her recommendations say, a total review
```

```
 1         of all available information, she said that
 2         she think that my grievance should be
 3         denied.  So she -- she say a total review,
 4         meaning that she read my grievance, and I
 5         guess in total and all.
 6    Q.   Do you think she took into consideration
 7         information from the Healthcare Unit?
 8    A.   Do I think she did?
 9    Q.   Yes.
10    A.   I think she spoke to them and wrote their
11         responses down, but I don't -- I don't think
12         she really took them into consideration.
13    Q.   Okay.  And you said that she had never met
14         with you face-to-face?
15    A.   Tara Goins, no.
16    Q.   So your only interaction with her then was
17         through the grievance process?
18    A.   Yes.
19    Q.   So she was never present at any of your
20         dental treatment?
21    A.   No.
22    Q.   As far as you know, is she a dentist?
23    A.   No.
24    Q.   Does she have any medical background, as far
```

```
 1          as you know?
 2    A.    Not that I know.
 3    Q.    Is there any other reason that you were
 4          suing her for, or is it just what we've
 5          talked about?
 6    A.    Just what we've talked with.  I believe she
 7          could have -- at each one of these points I
 8          believe that this could have been remedied.
 9          Each one of them had the authority to do so
10          and it was -- it was within their physical
11          capacity to give me dental -- to give me
12          dental treatment.  Any one of them could
13          have.  Even the counselor could have
14          spoke -- could have did more than he did
15          instead of him -- I don't know if he talked
16          to these people -- it seemed like one of the
17          counselors might have spoke to Deb Fuqua and
18          Dr. Scholz, but it seemed like that's it.
19          It was just -- just filling in the blanks.
20    Q.    Okay.  And --
21    A.    Going through the red tape.
22    Q.    How would you say they could have remedied
23          the situation; what would have been the
24          remedy in your view?
```

1   A.   In the beginning of the -- my gingivitis

2        problem, I think that maybe some type of

3        products could have been provided to subdue

4        gingivitis.  At that time I was seeing

5        dental products that says fights gingivitis

6        or reverses gingivitis, and I asked Dr.

7        Scholz if I could pay for them products

8        myself, and he told me no.  So --

9   Q.   Did you ever ask the defendants that we've

10       been talking about right now for these

11       products?

12  A.   Just Dr. Scholz, 'cause I knew that was the

13       only person that could provide them to me.

14  Q.   So is it your understanding then that the

15       other defendants could not have prescribed

16       any of these products that you had seen on

17       television?

18  A.   Yes.

19  Q.   Is it your understanding that any of the

20       defendants could not have prescribed any

21       treatment for you?

22  A.   All except for the warden.  The warden could

23       have okayed for me to get products,

24       different products if I was paying for them.

1           I seen situations like that before.

2    Q.    Were these prescription products?

3    A.    No, not prescription products.  Crest.  Over

4          the counter products.  Crest.  Mouthwash and

5          different --

6    Q.    Did you ask for that stuff, Warden

7          Zimmerman?

8    A.    No, I knew the procedure was to go through

9          Dr. Scholz and he would have to do some type

10         of paperwork and then get the warden to okay

11         it, and he refused to do that.

12   Q.    And did you make this request in writing?

13   A.    I spoke to Dr. Scholz in person about that.

14   Q.    Okay.  Were any of the defendants present

15         when you spoke with Dr. Scholz about this?

16   A.    No.

17   Q.    You also said that the defendants had the

18         authority to -- from my perspective it

19         sounds like to override the doctor's -- what

20         he had decided to do.

21   A.    No, but -- not the authority to override

22         what he said, but I believe that they had

23         the authority to look into this issue a

24         little bit more than what they did and could

```
 1         have recommended that treatment be given to
 2         me by Dr. Scholz or someone other than
 3         Dr. Scholz.
 4    Q.   Do you think that they had the authority to
 5         override Dr. Scholz's opinion?
 6    A.   If it's wrong, I believe so.
 7    Q.   Okay.  Do you think again, do you think that
 8         any of these defendants that we've been
 9         speaking about were dentists or had medical
10         backgrounds?
11    A.   No, but I think anybody could have seen that
12         it was a problem.  Just open my mouth and
13         look at it.  And I think a two-year-old
14         child with this could have seen, hey,
15         there's a problem there --
16    Q.   Did any of these defendants -- you said that
17         Roger Zimmerman had seen your mouth, your
18         issues.  Had any of the other defendants
19         looked into your mouth to see what was going
20         on?
21    A.   I believe maybe the counselor, one of the
22         counselors that I saw.
23    Q.   Which one was it?
24    A.   One of the counselors I saw showed my teeth
```

```
 1           to.

 2    Q.     Did you show them -- was it Steven

 3           Vanstrien?

 4    A.     Yeah.

 5    Q.     And when did that happen?

 6    A.     I don't know the exact date, but it was

 7           sometime in '06.  It had to been 8, 9, 10.

 8    Q.     Where did that take place?

 9    A.     In Western Illinois.

10    Q.     Where did you see Mr. Vanstrien?

11    A.     Oh, the counselor.  Housing Unit 4.

12    Q.     And was this before or after you filed a

13           grievance?

14    A.     This was before.

15    Q.     Why had he come to your housing unit?

16    A.     Why?

17    Q.     Yes.

18    A.     He was a counselor.  He was our assigned

19           counselor.

20    Q.     Did he visit on a regular basis?

21    A.     Yes.

22    Q.     Did you complain to him of your dental care?

23    A.     I wrote the grievance.  And when I wrote the

24           grievance, I think I went to his office and
```

```
 1        seen him and I told him I was having

 2        problems with my teeth.  And I -- I believe

 3        I tried to show him my teeth and he said,

 4        well, he's going to check into it.  And I

 5        got a response back and he say -- well, he

 6        didn't say that he spoke.  The response was

 7        from Deb Fuqua, and she said that she spoke

 8        to Dr. Scholz.  That response is in my first

 9        grievance dated 9-13-06.

10    Q.  How often did you see Mr. Vanstrien?

11    A.  I think I seen him once.

12    Q.  And so at that one time that you saw him is

13        when you showed him your teeth?

14    A.  Yeah.

15    Q.  Okay.  And was he a dentist?

16    A.  No.

17    Q.  Did he have the authority to override any of

18        the doctor's decisions that they were going

19        to make about your dental care and

20        treatment?

21    A.  No.

22    Q.  So he wasn't somebody that came around to

23        your housing unit on a regular basis then?

24    A.  Yes.
```

1    Q.    But you only spoke with him once?

2    A.    Yes, concerning this issue.

3    Q.    Did you speak with him about other issues

4          that you had then?

5    A.    I don't know if I did or not.

6    Q.    So you would see -- how often would you see

7          him in your housing unit?  Like how often

8          did he make rounds?

9    A.    I think he was there three, four times a

10         week maybe.

11   Q.    And were you in the same housing unit your

12         entire time at Western?

13   A.    No.

14   Q.    So was he the counselor that went to each

15         housing unit when you moved?

16   A.    He was only in one housing unit.

17   Q.    How long were you in that housing unit for?

18   A.    A few weeks maybe.

19   Q.    Okay.  And you had said earlier that you

20         only complained to him one time about your

21         dental care?

22   A.    Uh-huh.  Uh-huh.  Yes, that's correct.

23   Q.    In your complaints you talk about you had

24         asked for a transfer because the doctor had

```
 1              recommended that if you wanted treatment,
 2              that you could go to another facility where
 3              they might be able to offer you --
 4      A.      Yes.
 5      Q.      Did you ask for a transfer?
 6      A.      Yes.
 7      Q.      Okay.  When did you ask for this transfer?
 8      A.      I believe I was in Housing Unit 2 at the
 9              time.  But I didn't ask formally, you
10              know -- I spoke to a counselor.  And the
11              counselor --
12      Q.      Was it Defendant Vanstrien?
13      A.      Yes, it was a different one.  I asked the
14              counselor about a medical transfer, and the
15              counselor told me that if that -- that kind
16              of transfer need to be requested by a
17              doctor, which was Dr. Scholz.  So they
18              was -- I felt like they was sending me in
19              circles.  One was saying this, another one
20              was saying that.
21      Q.      Did the doctor say that you needed to ask
22              for a medical transfer or --
23      A.      He suggested that.
24      Q.      Okay.  Could you have been -- could you have
```

1  requested you just be transferred, not a
2  medical transfer?

3  A.  Not at that time.  I mean I could have, but
4  it would have been denied.

5  Q.  Why would it have been denied?

6  A.  I didn't have enough time in the
7  institution.  Their policy is they have to
8  observe a person for at least six months
9  before you can request a transfer.

10  Q.  Okay.  So you don't know when you had asked
11  for that transfer?  Was it in September of
12  '06?  When did you ask for it?  Even when
13  you had just informally asked for it.

14  A.  It was right after Dr. Scholz suggested it
15  to me.

16  Q.  So was that at your July 5, 2006, meeting?

17  A.  No, that was in 10-03-06.

18  Q.  And did you ask for a transfer anytime after
19  that?

20  A.  Anytime after that point, yes, I did.

21  Q.  When did you ask for a transfer a second
22  time?

23  A.  It wasn't concerning the medical transfer.
24  It was just a regular transfer.  And that --

```
1              that was 7-27-07.

2       Q.     And who did you send that request to?

3       A.     Karen Wear, W-E-A-R.

4       Q.     And had you requested from her earlier for

5              your first request, or did you just ask the

6              counselor and you were told you wouldn't be

7              able to transfer?

8       A.     No, my transfer was approved.

9       Q.     Your July 27, '07, transfer?

10      A.     Yes.

11      Q.     Okay.  When you had originally asked the

12             counselor about the medical transfer the

13             first time around, did you ever file a

14             formal transfer request?

15      A.     No, I did it the same way you supposed to

16             do.  You go in the counselor's office and

17             ask for a transfer.

18      Q.     Which counselor was that again that you had

19             gone to the first time?

20      A.     I don't know.

21      Q.     Do you know if it was Defendant Vanstrien?

22      A.     No, it wasn't Vanstrien.

23      Q.     Okay.  Okay.  So none of the defendants that

24             we've been talking about denied your
```

**E-FILED**
Tuesday, 15 April, 2008  12:40:48 PM
Clerk, U.S. District Court, ILCD

1      transfer?

2  A.   Well, it wasn't denied.  They told me the

3      proper procedure.  And they said for a

4      medical transfer have to be done through the

5      doctor.  And at that time I knew the doctor,

6      he didn't want to see me no more.  He wasn't

7      even answering my request slips anymore.

8  Q.   So did you ask any of the defendants for a

9      transfer that first time back in 2006?

10  A.   No.

11  Q.   And then when you requested the transfer

12      July 27 of 2007, your request was granted?

13  A.   Yes.

14  Q.   And did any of the defendants -- were any of

15      the defendants involved with this July 27,

16      2007, transfer?

17  A.   I don't know that process and who all is

18      involved.

19  Q.   Okay.  But your response -- your request was

20      granted?

21  A.   Yes.

22  Q.   And had you requested to be transferred to

23      Illinois River?

24  A.   Yes.

```
 1   Q.   Did you -- how does it -- did you ask for
 2        several facilities and you just got one of
 3        them that you requested?
 4   A.   I think it was three facilities, but
 5        Illinois River was the primary place that I
 6        explored.  It was my initial request.
 7   Q.   Okay.  And you've been here now for three
 8        weeks?
 9   A.   Yes.
10   Q.   Is there any other reason why you're suing
11        the defendants that we've been speaking
12        about today?
13   A.   No, except for I believe that they could
14        have -- they could have stopped this before
15        it even got this far, either one of them, if
16        they wanted to.
17   Q.   And how could they have stopped it?
18   A.   As far as their job description.  The
19        orientation manual, if you have a problem,
20        you first go to a counselor.  If the
21        counselor can't solve the problem, you can
22        write a grievance.  The grievance go back to
23        the counselor.  If it's not resolved, it go
24        to the grievance officer.  If it's not
```

```
 1            resolved on that level, then it can go to

 2            the Administrative Review Board.  So I did

 3            all that.

 4    Q.      And all those steps were followed?

 5    A.      Yes.

 6    Q.      And the only issue that you have is the

 7            outcome that they did not grant your

 8            grievance or the issues that you complained

 9            of in your grievance?

10    A.      Yes.

11    Q.      That your grievance had been denied?

12    A.      Yes.

13            MS. BRUCE:  I don't have any other

14         questions.

15            MS. POWELL:  I just have a couple

16         more.

17

18    REDIRECT EXAMINATION BY MS. POWELL:

19    Q.      How long do you brush your teeth?

20    A.      About two minutes.

21    Q.      Did you get any refreshers on how to brush

22            your teeth from the Dental Department?  Did

23            you ask for that?

24    A.      From Dr. Scholz?
```

```
 1   Q.   From anyone there.

 2   A.   No, I went to a book in the library, John

 3        Hopkins Medical Reference.  Dr. Scholz did

 4        them for me.  He said I need to brush after

 5        every meal, at least after every meal, and

 6        floss after every meal.

 7   Q.   And are you doing that now?

 8   A.   Yes.  I brush after every meal.  I brush

 9        when I wake up.  I brush before I go to

10        sleep.

11   Q.   And would you agree that that has helped?

12   A.   At that time it wasn't doing nothing.

13   Q.   Well, would you agree that it's helped your

14        condition now?

15   A.   No.

16   Q.   You wouldn't agree to that?

17   A.   No.

18   Q.   That it's helping your condition?

19   A.   No.

20   Q.   Why not?

21   A.   It's basic dental hygiene.  And, I mean, I'm

22        not a dentist.  I don't know if it's

23        helping, but I believe that this was what I

24        done for a year and it didn't -- it didn't
```

```
 1        do anything.  My gingivitis progressed, if
 2        anything.  So I'm assuming that it -- it
 3        didn't help then, it's not helping now.  And
 4        maybe in some type of way, I don't know,
 5        maybe it is.  Maybe it keeps the plaque down
 6        and that.  I don't know.
 7   Q.   Describe what I would have seen in your
 8        mouth during the time you were complaining
 9        of these problems.
10   A.   Red, swollen gums, been blood around them.
11        That's about what you would have seen.
12   Q.   And how long --
13   A.   A mouth full of blood.
14   Q.   And how long were your teeth like that -- or
15        were your gums like that?
16   A.   About a year.  But it wasn't -- the severity
17        was changed throughout the year.  It wasn't
18        constant.  It went from like maybe every two
19        or three days it would bleed, and then when
20        it started to -- it wasn't all the way up to
21        just constant bleeding.
22   Q.   Did your gums bleed when you brushed your
23        teeth?
24   A.   Yeah, severely.
```

1 Q. Did they bleed when you would floss your

2 teeth?

3 A. Severely, yes.

4 Q. And when you floss now, has that gone away?

5 A. It's gone away now. All the symptoms -- all

6 the symptoms I tell you about, told you

7 about, they stopped about a week -- about a

8 week, week and a half after Dr. Scholz root

9 planed and scaled my teeth and gave me the

10 antibiotics. So I feel like that year of

11 suffering and going through all that pain

12 was unnecessary when he could have done that

13 in the first place when he first diagnosed

14 me with my gingivitis. That would have been

15 over with. But like he told me, he had more

16 severe problems to deal with than me.

17 MS. POWELL: All right. I don't have

18 any other questions. Thank you.

19 You have a right to read the

20 deposition transcript to review it to make

21 sure that the court reporter took everything

22 down accurately. Or you can waive that

23 right and assume that she did it. But you

24 have to let us know today whether you want

1    to review it or whether you want to waive

2    that right.

3          THE WITNESS:  And so how do I review

4    it?  What does that entail?

5          MS. POWELL:  The deposition transcript

6    will be sent to the correctional facility

7    and they will bring you in a room and have

8    you look at it.

9          THE WITNESS:  So I couldn't pay for a

10    copy?

11          MS. POWELL:  You can buy a copy as

12    well.

13          THE WITNESS:  Okay.  Okay.

14          MS. POWELL:  That's completely

15    separate.  Off the record.

16

17

18

19

20

21          FURTHER DEPONENT SAITH NOT.

22

23

24

```
 1    STATE OF ILLINOIS    )
                           )
 2    COUNTY OF KNOX       )

 3

 4

 5              C E R T I F I C A T E

 6      I, Amy S. Powers, CSR, RPR, a Notary Public

 7    duly commissioned and qualified in the State of

 8    Illinois, DO HEREBY CERTIFY that pursuant to

 9    notice there came before me on the 29th day of

10    January 2008, at Illinois River Correctional

11    Center, Route 9 West, in the City of Canton,

12    County of Fulton, and State of Illinois, the

13    following named person, to wit:

14

15              MICHAEL STEVENSON, #N93569,

16

17    who was by me first duly sworn to testify to the

18    truth and nothing but the truth of his knowledge

19    touching and concerning the matters in

20    controversy in this cause and that he was

21    thereupon carefully examined upon his oath and

22    his examination immediately reduced to shorthand

23    by means of stenotype by me.

24        I ALSO CERTIFY that the deposition is a true
```

1    record of the testimony given by the witness and

2    that the necessity of calling the court reporter

3    at time of trial for the purpose of

4    authenticating said transcript was also waived.

5        I FURTHER CERTIFY THAT I am neither attorney

6    or counsel for, nor related to or employed by,

7    any of the parties to the action in which this

8    deposition is taken, and further, that I am not a

9    relative or employee of any attorney or counsel

10   employed by the parties hereto, or financially

11   interested in the action.

12       IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal at Galesburg,

14   Illinois, this 15th day of February 2008.

15

16   _____

17   AMY S. POWERS
     Certified Shorthand
18   Reporter

19

20   "OFFICIAL SEAL"
     Amy S. Powers
     Notary Public, State of Illinois
21   My Commission Exp. 07/21/2009

22

23

24

<u>SIGNATURE PAGE</u>

```
MICHAEL STEVENSON, Inmate      )
#N93569,                       )
                               )
              Plaintiff,       )
                               )
          -vs-                 )   No. 07-3108
                               )
DR. SCHOLZ, et al.,            )
                               )
              Defendant.       )
```

    I hereby certify that I have read the foregoing transcript of my deposition, consisting of pages _____ through _____ inclusive, and I do again subscribe and make oath that the same is a true, correct, and complete transcript of my deposition given as aforesaid, with corrections, if any, appearing on the attached correction sheet(s).

        Please check one:
        _____ I have submitted correction(s).
        _____ No corrections were noted.

        Dated this _____ day of _____, A.D., 2008.

        SIGNED _____
                Michael Stevenson, #N93569


        Subscribed and sworn to before me this _____ day of _____, 2008.


        _____
        Notary Public


        My commission expires
        _____